**Donna LIPPOLDT, individually, Operation Save America, an unincorporated association, and Phillip Benham, individually Plaintiffs,**

v.

**Deputy Chief Stephen COLE, in his official and individual capacity as an agent/employee of City of Wichita, Kansas, a political subdivision of the state of Kansas, Beth Harlenske, in her official and individual capacity as an agent/employee of City of Wichita, Kansas, a political subdivision of the state of Kansas Defendants.**

No. 01–1226–JTM.

United States District Court,
D. Kansas.

March 31, 2004.

Frederick H. Nelson, American Liberties Institute, Orlando, FL, Richard A. Macias, Wichita, KS, for Plaintiffs.

Elizabeth Harlenske, Gary E. Rebenstorf, Jay C. Hinkel, Mary A. McDonald, Michael L. North, City of Wichita, Kansas—Law Department, Wichita, KS, for Defendants.

Emily B. Metzger, Office of United States Attorney, Wichita, KS, for Amicus.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter, involving a dispute over the denial of parade permits was tried to the court. Plaintiffs Donna Lippoldt ("Lippoldt") and Phillip Benham ("Benham") bring this action asserting that by denying their submitted parade permits defendants Stephen Cole ("Cole") and Beth Harlenske ("Harlenske") violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and federal law, particularly 42 U.S.C. § 1983, and §§ 1, 2, 3, 7, 9, and 11 of the Kansas Bill of Rights. The court hereby makes the following findings of fact, based upon the documentary exhibits (including those presented to the court in support of prior pending motions), previously presented uncontroverted facts, and, where facts are controverted, upon the documentary evidence and testimony presented at trial. All findings are further grounded in the court's credibility determinations as to the individual witnesses. Throughout this opinion, the phrases "pro-life" and "anti-abortion" are used interchangeably.

### Findings of Fact.

*The Parties.* Lippoldt is a resident of Sedgwick County, Kansas. Benham is a Free Methodist minister currently based in North Carolina. Lippoldt was responsible for coordinating the 2001 Summer of Mercy Renewal event ("Summer of Mercy Renewal" or "Event"), which consisted of a number of activities designed to protest abortion, including a Christian concert, an all-night prayer service, an assembly and parades.

Cole is Deputy Chief of Police of the City of Wichita Police Department ("WPD"). He was in charge of overseeing the WPD's responsibilities during the Event at Event-related activities.

Harlenske is an Assistant City Attorney for the City of Wichita. In that capacity, she advises City clients, including the Wichita Police Department, under the direction and assignment of the City Attorney, Gary Rebenstorf.

*The Summer of Mercy Renewal.* The protests took place throughout the City of Wichita from July 13, 2001 to July 21, 2001. The Summer of Mercy Renewal commemorated the ten-year anniversary of the so-called "Summer of Mercy" anti-abortion protests led by Operation Rescue

in Wichita in 1991. Planning for the Event began approximately 12–16 months before the scheduled date. This was the first time Lippoldt had been the main organizer of an event of this size.

The Renewal was nominally organized under the banner of Operation Save America. Benham refers to himself as the "Director" of Operation Save America–National ("OSA–N"). OSA–N does not collect dues, and does not have any membership rosters. It does not have bylaws, or any organizational documents. Benham claimed his group had a federal identification number but did not know when that was received. Franchising documents do not exist for his group number. Benham is solely responsible for determining and approving all OSA–N activities and expenditures.

Lippoldt and her husband began calling themselves Operation Save America–Wichita ("OSA–W") in 2000, for identification purposes. The activities in which Ms. Lippoldt, her husband and volunteers participate have been represented as being undertaken by OSA–W. That organization includes lay people of like minds, as well as pastors planning anti-abortion events. There is no specific membership designation.

The Event was publicized throughout this country, both by pro-life and pro-choice advocates. Approximately twenty-four or twenty-five churches agreed in advance to participate as pro-lifers, but only twelve of those churches did in fact participate. Lippoldt had not known fewer churches to actually participate than had agreed to participate in this type of event. Similarly, approximately 1,400 people pre-registered for the Event. Lippoldt and Benham expected twice the number of pre-registrants to actually attend, but approximately 1,000 people actually signed in. Neither Lippoldt nor Benham has ever known an event to have fewer attendees than pre-registrants. The pre-registrants were not required to pay a fee to guarantee attendance. They were required to have their pastor's permission to attend, and were required to execute a pledge of non-violence. Attendees executed the pledge of non-violence at the door, prior to the Sunday evening rally.

*Operation Safe Protest II.* In response to the nationwide call of leaders on both sides of the issue to come to Wichita, the Wichita Police Department ("WPD") developed a tactical plan known as Operation Safe Protest II, which had the following stated goals:

Insure compliance with current laws, which provide for freedom of access to reproductive healthcare centers;

Insure that the civil rights of demonstrators are protected and provide equal protection of the law to all persons; and

Conduct the operational plan in a manner to provide safety for all persons who may be impacted by the planned event.

Williams, Wichita's Chief of Police, placed Cole in charge of Operation Safe Protest II, overseeing the WPD's responsibilities during the Event. Cole was thus responsible for the initial planning which commenced approximately three to four months prior to the event. There were several different operational plans prepared in May 2001, for the events of July 2001. The last revision to the plan was July 1, 2001. The organizational plan included the closure of Bleckley Street to pedestrians, and it addressed the closure of Bleckley to vehicles. Specifically, traffic on Bleckley was limited to people living in the area, or doing business at that location on the south half of the block between Orme and Kellogg Drive. The rest of the street was closed to all traffic. *The Early Discussions.* Lippoldt began discussions with Captain Dotson about the summer events around February 2001, meeting

with Dotson personally at least twice. She never mentioned to Captain Dotson or city staff her desire to have parades, with the exception of the downtown parade, but did discuss the particulars of that parade with Sgt. Pike. In his conversations with Benham and Lippoldt, Captain Dotson did not recall either of them mentioning a desire to have parades. Dotson also recalls Benham telling him (Dotson) that no one in Benham's organization or the national organization would work with Dotson.

*The First Parade Permit.* Lippoldt applied for and was granted a permit for a July 16, 2001 parade in the downtown area. Lippoldt described the planned downtown parade as having balloons, children, and a public proclamation of the Emancipation Proclamation for the unborn, with the signing of the proclamation at the end of the parade. Lippoldt noted that this parade focused on the Emancipation Proclamation for the unborn and was a part of the Summer of Mercy Renewal Event. Lippoldt admitted that this event gave her the opportunity to express any type of free speech that she desired, and that she wished to express religious views through the parade. She wanted to parade with her associates to convey that abortion was wrong. Benham also sought to express a religious message through his parade activities.

Cole knew that Lippoldt intended to have their downtown parade and made no move to prevent it. The parade was held as scheduled on July 16, 2001.

*The Additional Parade Applications.* On July 6, 2001, after the permit for the downtown parade had been approved, but before the parade took place, Benham had Lippoldt and an OSA member apply on his behalf for 10 more parade permits. Benham's name does not appear on the applications, but he intended to participate in the parades, along with his associates. Lippoldt paid a total fee of $150.00 (10

permits × $15 per permit) when submitting the applications to the City. Each of plaintiffs' parade applications was properly completed; none was technically wrong or incomplete.

This was the City's first notice of Lippoldt's desire to have parades on a route that included Bleckley Street, which, as noted above, was to be closed. In Cole's prior contacts with organizers prior to the event, no one had mentioned parades on Bleckley Street. Closing Bleckley Street, which was an administrative closure, was always part of the Operation Safe Protect plan, and was similar to a plan which closed Bleckley Street in 1995.

*The City Ordinance.* Chapter 3.13.050 of the City Code of the City of Wichita is the only ordinance regulating parades. It states "Upon receipt of a properly completed application form and upon payment of the fee as above provided, the city treasurer shall issue a permit as provided for hereunder." The contents of a parade application in the City of Wichita, Kansas are limited to those contained in Chapter 3.13.050(2) of the City Code of the City of Wichita. Six subsections in that chapter delineate the only exceptions for denying a parade application.

*The Parade Application Process.* Sgt. Pike normally reviews the parade applications submitted to the City of Wichita. He communicates to parade permit applicants any concerns and technical defects in the applications. While he testified that if an applicant refused to solve the problem, he would deny the request, Sgt. Pike was unaware of any other parade application that the City of Wichita had denied. All prior applicants had cured their deficiencies. Sgt. Pike typically notifies the applicants by telephone whether or not their parade applications have been granted.

Legislative closure is done by the city council for events much like River Festival

which holds its Sundown Parade as one of its events. This encompasses street closure for events other than parades. When parades are held, there is a diversion of traffic on the streets of the parade route for a minimal period of time. However, an administrative closure, as utilized in this case, is for reasons relating to public safety concerns. Exs. 12, 15, 18 pertain to licensing information from the River Festival.

Sgt. Pike did not recall ever granting an escort parade permit for a portion of a two-lane road, due to safety considerations. This type of option requires at least four lanes.

Sgt. Pike had not seen the administrative order closing Bleckley Street during July 2001. In fact, he did not know in July 2001 that Bleckley Street was scheduled to be closed. He knew there was a plan prepared to address the police issues for the summer protests. However, he had never seen the planning document, and did not know the details of the operation. The Field Services Department, which was not within his section, was responsible for it.

Given his position as operations commander for the Event, it was not unusual for Cole to receive the parade applications. As operations commander, Cole knew that the plan was to close Bleckley Street. Field Services, the area he commanded, was in charge of the police response in that area in the Summer of 2001. Cole requested the Law Department assist in giving an opinion and assistance on the denial of the parade applications.

Cole thought plaintiffs wanted to run two parades per day, lasting three hours each, which would disrupt the Police Department operations and block the clinic, but he did not believe his opinion formed the basis of any decision regarding the denial of the parade permits.

Cole believed that the requested times and dates for the parades were unreasonable, but relied upon the law and the advice of the Legal Department. He agreed with the contents of the July 11, 2001 letter denying the plaintiffs' parade applications.

The Police Department gave notice to plaintiffs that Bleckley was not going to be a location open to the public and/or vehicular traffic, thus a parade permit could not be issued. Although the WPD also stated that the proposed parades would violate section 5.66.0557 by interfering with businesses, Sgt. Pike testified that he regularly grants parade applications that interfere with businesses. In compliance with its duties under the parade ordinance, the City Treasurer's Office also notified Plaintiffs by letter that their request for parade permits had been denied.

In light of this street closure, Cole attempted to work out an alternative route for the plaintiffs' parades. These negotiations were not successful. Cole did not suggest that the plaintiffs' parades could be accommodated by a more limited period of time at the Bleckley location.

*Chief Williams.* Chief Williams's department reviews parade applications, and if there are concerns, they express them to the treasurer's office. Chief Williams did not know that there were parade applications submitted for a route that included Bleckley until July 11, 2001, during a phone conversation with Cole. The day before, on July 10, 2001, Chief Williams had signed an administrative order closing Bleckley Street, such closing to commence on July 24, 2001, at 9:00 a.m. Bleckley was not reopened to the public and/or vehicular traffic until August 6, 2001.

Chief Williams had authority by city code to close streets in the City of Wichita by temporary regulation. Prior to signing the administrative order closing Bleckley, Chief Williams consulted with defendant Harlenske, who advised him of his authori-

ty to close Bleckley Street by regulation under Section 11.10.030 of the Code of the City of Wichita.

In late April or early May 2001, Harlenske was assigned the task of drafting the temporary regulation for closure of Bleckley Street. After the Chief received the temporary regulation from the legal department, he had the chance to change it or clarify the contents, but did not request any changes or clarification. The order cited an ordinance section which gave the Chief of Police, with the approval of the traffic engineer, the authority to enter temporary regulations. Chief Williams has the authority by city ordinance to enter these temporary regulations.

*Harlenske's Letter for Chief Williams.* The City Attorney assigned Harlenske the task of drafting a letter for Chief Williams. She did so, provided it to the City Attorney, who altered it, and gave it to the secretary for printing. Harlenske saw the final form of the letter prior to Cole signing it. She drafted the letter under time pressure, as Mr. Nelson demanded that the parade applications be granted or denied by the close of business that day. Harlenske ultimately read the letter aloud to Chief Williams, during a phone conversation. Harlenske does not modify the work of her supervisor after her work has been reviewed by him. After Harlenske read the letter to Chief Williams by phone, she handed the phone to Cole who spoke with the Chief.

During the conversation, Cole and Williams discussed the contents of the letter. Chief Williams also had the opportunity to amend the letter. Chief Williams authorized Cole to sign the denial letter, and at the conclusion of the call, Cole did so relying upon the advice of counsel.

Cole signed the letter with his (Cole's) name for Chief Williams.[1] As a subordinate of Chief Williams, Cole asked for the Chief's specific approval and/or comments about the letter. When he signed the letter, Cole knew that the letter stated that one of the reasons the applications were being denied was that the parades would interfere with businesses. He also knew that other parade applications had been granted even though the parades interfered with businesses.

The denial of the permits were reviewable by the City Council at its next scheduled meeting, which was within days of the denial.

Cole has been trained in the area of First Amendment law and free expression. He understands that parades are a form of free speech protected by the First Amendment and that the government must have clearly defined policies to deny a parade application. Cole further understands that the government may not use discretionary opinions outside of its written legislation to deny a parade application.

Harlenske was assigned to research the law on parade applications after plaintiffs' parade applications were filed, which was before she wrote the July 11, 2001, letter denying plaintiffs' parade applications. Harlenske's research covered all the major cases relating to parade applications, revealing that the government must have clear guidelines in order to restrict access to parades.

Harlenske was aware of cases specifically holding that parades are forms of expression entitled to First Amendment protection. She testified that she reviewed Chapter 3.13.050 of the City Code of the City of Wichita prior to writing the July

---

1. Had Cole been signing under his own authority as a Deputy Chief, he would have signed only his name to the document.

11, 2001 letter denying the plaintiffs' parade permits.

Harlenske's review of Chapter 3.13.050 established that a parade permit "shall be issued" upon receipt of the parade application and payment of the fee, and case law interprets that language as mandatory. She testified that the six subsections found in Chapter 3.13.050 did not give any reason to deny the plaintiffs' parade applications, further stating that those subsections did not authorize denial of a parade permit on the ground that it would interfere with a business. In fact, Harlenske does not know of any City of Wichita ordinance allowing any person to deny a parade application. Finally, Harlenske testified that a violation of Chapter 3.13.050 carries a criminal penalty.

*Wright, Knight and Central Christian Church.* Pastor Joe Wright is the senior pastor at Central Christian Church ("Central Christian") and is also chairman of the board for Choices Medical Clinic ("Choices"). Choices is located next to Dr. Tiller's clinic on Bleckley Street, assisting women who are in crisis pregnancies. The clinic gives counseling, helps with adoptions, and performs free sonograms. Central Christian financially supports Choices and is pro-life.

Pastor Wright described Chief Williams and then Wichita Mayor Bob Knight as friends. Wright also knows Lippoldt, and views her as a friend and fellow person involved in the pro-life movement. Wright is acquainted with Benham. The acquaintance was made during Benham's trips to Wichita, and his involvement in the pro-life community.

Benham and Lippoldt approached Pastor Wright about the summer events of 2001, and Wright agreed to allow the rallies to be held at his church. Lippoldt and Benham then requested that they be allowed to hold the rallies in the 3,000 seat auditorium. However, as an unrelated event had been scheduled prior to plaintiff's request, Wright said the rallies could be held in the gymnasium area of the church. The gym seats about 1,000 persons; Wright was not certain whether or not it was air-conditioned.

Ultimately, Wright and his church's elders denied plaintiffs use of the gym. Several concerns were raised, the first of which was Benham's conduct. Benham had previously climbed on the roof of Choices and shouted at individuals at Dr. Tiller's clinic. Wright was also concerned about items Benham had posted on his website. For example, Benham portrayed Choices as less pro-life than Benham's group. He also posted claims that Choices was utilizing pro-life funds in an improper manner. Finally, Benham asserted that Choices would not allow Benham's group to use the Choices' property in the manner Benham wished.

Pastor Wright met with Benham and others to address those concerns. During the meeting, Benham finally apologized, and said he would retract the statements on his website. After weeks had passed, and following several phone calls from Wright to Lippoldt, Benham's "retraction" appeared, but it was no retraction at all. It contained no apology, but only statements that Wright's church would participate in the rallies. Wright found the "retraction" unsatisfactory.

Wright continued to have other concerns over Benham's conduct. Wright attended rallies where Benham made derogatory remarks about Choices knowing Wright was in the audience. At another event, Benham seemed to advocate that breaking the law was appropriate for defending the unborn, causing Wright concern that laws would be violated.

While Benham was disparaging Choices and apparently advocating breaking the law, Central Christian was preparing a

contract for the plaintiffs concerning the church's participation in the Event. The contract sought to address the concerns which had been raised, and allowed the church to evict the rallies if the Elder board decided it was necessary.

The contract was never executed; the concerns became so serious that Central Christian withdrew its offer of the Church gym. The church made this decision shortly before the Event. Pastor Wright was willing to assist financially if the Board's decision led to problems in finding an alternate site.

Pastor Wright then called a meeting with other preachers and ministers in the community. Seven other local pastors attended the meeting. He solicited their comments on the Event, and told them his church would not be utilized for the Event. During the meeting, three of the pastors indicated that they did not know about the Event, and four said they were concerned about the Event, so much so that they were not taking an active role in it. Wright told the collected pastors that his church's non-participation was due to a lack of trust in Benham's judgment. Wright did not want Benham using his church or being at his church giving leadership, summing up his position by noting that his dad would say, "I didn't want to hook my wagon to that team." All pastors were from pro-life churches.

Mr. Knight requested from Lippoldt a list of pastors participating in the events of 2001. Mr. Knight recalls telling Pastor Wright that he thought it unusual that Lippoldt would refuse to tell a Christian, pro-life mayor, the identities of the pastors supporting the summer events.

Mr. Knight's opinion of the manner in which Lippoldt and Benham communicate the pro-life message was not flattering.

Mr. Knight met with Pastor Wright, who he considers a friend, but both are independent thinkers. Mr. Knight denied characterizing plaintiffs Lippoldt and Benham as extremists engaged in extremist pro-life activities. Mr. Knight also denied suggesting to Pastor Wright that his church should reconsider allowing the pro-life activities to occur there.

Mr. Knight has no fondness for efforts to divide a community. As mayor, he wanted to unite the community. In his opinion, others can share concern for the unborn. He thought Benham's and Lippoldt's tactics hurt the pro-life message.

Pastor Wright's discussions with Chief Williams and Mayor Knight did not impact either his or the Elder Board's decision. No city official was involved in calling or presenting information at this meeting, as Pastor Wright called the meeting to address the perception of his church in the pro-life community.

The City has subsequently allowed Lippoldt to have parades on Bleckley Street on a date it was not closed to traffic. Lippoldt submitted an application for a parade permit on October 7, 2001. Lippoldt was allowed to hold this parade, which included Bleckley Street.

Lippoldt thought the presence of six police cars with red lights discouraged participation in this subsequent event. However, she admitted that a portion of the parade was on Kellogg Drive, which is not separated by barrier from the U.S. 54 highway.

*Evidence of Damages.* Plaintiffs claim the denial of the parade permits and a change in the location of the evening functions negatively impacted attendance and donations. Lippoldt testified that the event was funded by donations to offset the expenses. Lippoldt could not swear that her group posted the decision to deny parade permits on their website. However, the local media released this information. Lippoldt did not suggest that people

around the country read the local newspaper.

The court made its ruling allowing for the parades the Monday prior to the requested commencement of parade activities on Bleckley street on Tuesday. Benham held a press conference on the steps of the courthouse after the court's decision. There was news coverage that publicized the court's ruling allowing the parades on Bleckley. Lippoldt did not believe the news concerning the parades going forward was posted on her organization's website.

Plaintiffs believe that the City's refusal of the parade permits, taken in conjunction with other City acts, worked to dissuade people from attending, due to the impressions created that illegal conduct would be present. When asked to quantify the amount of damages solely related to denial of the parade permits, Benham was unable to respond to the question. No collections were taken at any of the parades. However, no one told Lippoldt that they did not attend due to the denial of the parade permits, nor did she receive any correspondence from anyone indicating as much.

The weather during the Event was hot, resulting in the cancellation of one parade, but Lippoldt could not determine what effect the heat might have had on participation at the other parades. She thought the weather would not have had an effect on evening rallies, as the forum was airconditioned.

The outside events included the parades, and the protests held outside the clinic.

Lippoldt asserted that the lack of attendance was due to the media reports surrounding the denial of the parade permits, as well as the attitude of the City and City officials, not wanting their group in the City. Benham testified that the denial of the parade applications was communicated to people on July 11, 2001.

Benham felt the bond order "chilled" people from attending, as they did not want their children involved in illegal activity.

Lippoldt said that offerings were requested during the evening events. The offerings were to be utilized for expenses of the event. Lippoldt did not collect the amount of money from the offerings that she expected. Lippoldt admitted that the money received was from freewill offerings, and people could choose to donate, or not, as they saw fit. The offerings were requested each evening.

Lippoldt testified that in her experience the financial funding of the event was adversely impacted and donations were reduced as a result of the fewer participants. She estimated that donations were down about 30%, based solely on her activities and coordination of the Event.

When asked to speculate as to the amount of damages due to lack of attendance, plaintiff Benham disagreed with the 30% figure quoted by Lippoldt. He thought they lost approximately 50% of their revenue from offerings. When pressed to estimate a dollar amount, he testified it was about $20,000.

Lippoldt's estimate of damages was based upon the plan to hold the evening rallies at Central Christian Church, a church which would seat 3,300 people. Lippoldt also claimed that Pastor Wright of the church would not allow the rallies at the church after he met with the mayor. As a result, Lippoldt said that they had their rallies in a church with less seating available.

Lippoldt testified that this change of location happened within a month of the summer's event. The change of location was publicized by Lippoldt and others.

The pastor of Central Christian Church, Joe Wright, met with Lippoldt on several

occasions. He never indicated to Lippoldt that the reason his church refused to provide space for the evening rallies was based upon the denial of the parade permits.

Lippoldt, in response to the court's questioning said that "hundreds" of people told her they did not attend the event because the location of the evening rallies had changed from Central Christian Church to the smaller church.

Benham also claimed that Pastor Wright's church refused to host the evening rallies, as it did not want to be involved in the activities. As a result, he claims they lost a 3,500 seat location, for a smaller church, seating only 300.

Plaintiff Benham claimed that only 1,000 people attended the Event. He alleged that the change of location for the evening rallies caused people to avoid those rallies, as the auditorium seating capacity was smaller.

The testimony set forth in this section constitutes is the sum and substance of the evidence on damages. Indeed, it is the only evidence presented at trial on the issue of damages.

### Conclusions of Law.

■ Public streets are recognized as traditional public fora for first amendment expression. *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). License restrictions on parades can operate as a prior restraint on speech, but reasonable time, place and manner restrictions may be imposed. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). However, an ordinance that allows discretionary application is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Heffron v. Int'l. Soc'y for Krishna Consciousness, Inc.*, 452 U.S.

640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

■ In the court's orders of July 16, 2001 and May 28, 2003, the court found the City of Wichita's parade ordinance to be constitutional, based largely on the parade ordinance eliminating virtually all of the licensing official's discretion. Such a requirement is a necessary component of any prior restraint on speech.

The parade ordinance sets out six concrete and specific exceptions which permit the licensing official to deny parade permits. Parade permits may be denied if a parade is held for the sole purpose of advertising a product and other limitations that fall within the category of specifically listed time, place and manner restrictions. Unless the requested parade permit falls into one of these categories, the parade ordinance states that the licensing official "shall issue a permit." The court finds that the parade permits submitted by the plaintiffs did not fall into one of the parade ordinance's specific exceptions. Thus, the defendants' decision to act outside of the parade ordinance and deny the parade permits amounts to an act of discretion. Licensing officials are not permitted to exercise such discretion even if it is connected to a seemingly reasonable purpose, *i.e.*, in conjunction with the City of Wichita's plan to facilitate protesting. Furthermore, the court cannot and will not allow the defendants to circumvent the parade ordinance by closing certain streets, thereby removing them from the definition of "street" under the parade ordinance, nor can the court permit the defendants to institute a plan that would essentially keep the plaintiffs from parading at the Bleckley street location. Cole testified that he did not suggest any alternative that the plaintiffs' parades could be accommodated by a more limited period of time at the Bleckley street location because "that loca-

tion was not an acceptable location." An "acceptable location" is largely in the eye of the beholder, and that is why this type of discretion simply is not permitted under the parade ordinance. Taken to an extreme, such discretion could result in allowing a parade only in a deserted area, which would totally defeat at least two purposes of free speech—to take a position to the public and to trigger debate on that issue. Accordingly, the court finds that the denial of the parade permits was based on an unconstitutional application of the parade ordinance.

■ Defendants Harlenske and Cole argue that they did not proximately cause the denial of the plaintiffs' parade permits. They correctly point out that the causation element of § 1983 requires that the particular defendants sued must have subjected a citizen to the claimed deprivation. *Tonkovich v. Board of Regents,* 159 F.3d 504 (10th Cir.1998). Defendants Harlenske and Cole assert that the plaintiffs have not shown that they personally participated in the constitutional violation. However, the court is unpersuaded by this argument. Harlenske drafted the letter denying the parade permits. Harlenske also testified that she was assigned to research the law on parade applications after plaintiffs' parade permits were filed. Through this research, she discovered cases revealing that the government must have clear guidelines in order to restrict parades. Cole signed the letter denying the plaintiffs' parade permits. Although Cole testified that he undertook this act with approval from Chief Williams, the record shows that Cole was fully apprized of the situation and personally involved in the process. He also testified that he agreed with the contents of the letter. The court thus finds that defendants Cole and Har-

lenske personally participated in the denial of the parade permits. Accordingly, the court also concludes that defendants Cole and Harlenske unconstitutionally applied the parade ordinance.

Following the trial, the plaintiffs raised several arguments regarding the City's appearance bond order and the defendant City of Wichita's responsibility for its implementation. Pursuant to the court's order of May 28, 2003, the court dismissed the plaintiffs' claims relating to these matters and dismissed the defendant City of Wichita from this action.[2] Accordingly, the court declines to further examine these matters.

■ The plaintiffs request compensatory damages and costs along with injunctive relief. The court first notes that speculative damages are not to be awarded. *Gunby v. Penn. Electric Co.,* 840 F.2d 1108 (3d Cir.1988). Plaintiffs' damage claims are based on assumptions only. Indeed, plaintiffs cannot agree on an appropriate damage figure. Lippoldt testified that about thirty percent of donations were lost; Benham testified that the figure was closer to fifty percent of donations (in his estimate about $20,000). Neither can the plaintiffs quantify any damages attributable to the denial of the parade permits. Lippoldt testified that the money received at the events were from freewill offerings. It is not possible to quantify such free-will offerings made by voluntary attendees. The plaintiffs assert, but have not established, any link between parade participation during the day and evening rally participation. The court finds that the denial of the parade permits was not the proximate cause of the plaintiffs' damages, as no offerings were ever requested at the parades.

2. The plaintiffs filed a motion to reconsider this order (Dkt. No. 104). The court denied the motion to reconsider.

 Plaintiffs emphasize the role of the mayor and Captain Dotson's attitude, the change of venue from a large auditorium to a smaller venue, lack of participation of Central Christian church members and the denial of its facility as causes of their damages. However, the plaintiffs fail to link these events to the denial of the parade permits. Thus, the plaintiffs have failed to prove they are entitled to compensatory damages.

However, the court may and should award plaintiffs nominal damages for their injuries. "[N]ominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 308, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)(discussing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). "[T]he loss of First Amendment freedoms, even for a minimal period of time, constitutes an injury." *Trewhella v. City of Lake Geneva, Wis.,* 249 F.Supp.2d 1057, 1070 (E.D.Wis.2003) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)) (additional citations omitted). Accordingly, the court awards the plaintiffs nominal damages in the amount of $1.00.

Plaintiffs are also granted reasonable costs and expenses of this action including attorneys' fees.

 Plaintiffs have not presented an adequate factual or legal basis to merit injunctive relief. The court finds no basis for the likelihood of future harm occurring. "An injunction is only appropriate where future conduct is at issue." *Prairie Band of Potawatomi Indians v. Wagnon,* 2003 WL 21920915 * 10 (D.Kan.2003).

The court retains jurisdiction of this matter for the purpose of enforcing this order.

IT IS THEREFORE ORDERED this 31st day of March, 2004 that the court:

1) finds for the plaintiffs on the violations of their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and federal law by defendants Cole and Harlenske;

2) denies injunctive relief;

3) awards plaintiffs damages in the amount of $1.00; and

4) awards costs and expenses, including reasonable attorneys fees, to plaintiffs in an amount to be determined.