**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DONNA LIPPOLDT, individually;
OPERATION SAVE AMERICA, an
unincorporated association; PHILIP
BENHAM, individually,

      Plaintiffs-Appellants and
      Cross-Appellees,

v.

STEPHEN COLE, Deputy Chief, in
his official and individual capacity as
an agent/employee of the city of
Wichita, Kansas; BETH
HARLENSKE, in her official and
individual capacity as an
agent/employee of the city of Wichita,
Kansas; CITY OF WICHITA, a
political subdivision of the State of
Kansas,

      Defendants-Appellees and
      Cross-Appellants.

Nos. 04-3156, 04-3168, 04-3322

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 01-CV-1226-JTM)**

---

Frederick H. Nelson, American Liberties Institute, Orlando, Florida (Richard A.
Macias, Wichita, Kansas, with him on the briefs), for Plaintiffs-Appellants/Cross-
Appellees.

Jay C. Hinkel, Assistant City Attorney (Gary E. Rebenstorf, City Attorney, with him on the briefs), City of Wichita, Wichita, Kansas, for Defendants-Appellees/Cross-Appellants.

Before **BRISCOE, McWILLIAMS,** and **EBEL**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiffs appeal (04-3156) and defendants cross-appeal (04-3168) the district court's orders concerning the constitutionality of the City of Wichita's ("City") denial of plaintiffs' ten parade permits, and a municipal court bond order. Lippoldt v. City of Wichita, 265 F. Supp. 2d 1228 (D. Kan. May 28, 2003); Lippoldt v. Cole, 311 F. Supp. 2d 1263 (D. Kan. Mar. 31, 2004). Plaintiffs' counsel also appeal (04-3322) the district court's decision denying most of their requested attorney fees.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's decision in case number 04-3156. We affirm in part and reverse in part the district court's decision in case number 04-3168, and remand to the district court with direction to dismiss the claims of Operation Save America ("OSA"). Last, in case number 04-3322, we affirm in part and reverse in part, and remand to the district court to address anew counsels' request for fees and costs.

I.

This suit concerns the City's response to the Summer of Mercy Renewal, plaintiffs' planned anti-abortion protests in July 2001, which commemorated the ten-year anniversary of similar protests in 1991. Plaintiffs Donna Lippoldt, OSA, and Philip Benham challenge the City's denial of their parade permits and the municipal court's bond order. OSA is an unincorporated association consisting of a group of volunteers who oppose abortion. Benham is OSA's Director, and Lippoldt volunteers for OSA-Wichita. The named defendants include the City, as well as Stephen Cole, Deputy Chief of Police for the City, and Elizabeth Harlenske, an Assistant City Attorney.

*A. Denial of OSA's application for parade permits*

As part of the Summer of Mercy Renewal, on July 6, 2001, Lippoldt applied for eleven parade permits on OSA's behalf. Lippoldt requested permits for two parades per day from July 17, 2001, through July 21, 2001, with a proposed route that included Bleckley Street and East Kellogg Drive, where Dr. George Tiller's abortion clinic is located.[1] Lippoldt requested an additional parade permit for a parade in the downtown area.

Under the City's parade ordinance, the City Treasurer "shall issue" a parade permit, unless one of six enumerated exceptions applies. Wichita City

---

[1] Dr. Tiller is an abortion provider, and his Wichita clinic has long been a target for anti-abortion protests.

Code § 3.13.050 (emphasis added). The parties agree that none of the exceptions listed in Section 3.13.050 provide grounds for denying plaintiffs' parade permits.

Deputy Chief of Police Cole reviewed plaintiffs' parade applications. Cole explained, "it was my belief that the situation that we were dealing with out there warranted a denial, and I asked the law department for an opinion on that and for assistance." App. Vol. IV, at 600. Assistant City Attorney Harlenske researched the law regarding applications for parade permits and drafted a letter denying plaintiffs' applications. After the City Attorney revised it, Harlenske read the final version of the letter aloud to the police chief over the phone. With the police chief's approval, Cole signed the denial letter in his name on behalf of the police chief. Cole did not suggest any alternative to plaintiffs for accommodating the parades for a shorter period of time at the Bleckley street location because "that location was not an acceptable location." App. Vol. IV, at 586.

On July 10, 2001, one day before the City issued its decision on the plaintiffs' parade applications, the police chief signed a temporary regulation closing Bleckley Street to all vehicles, except those of residents or people conducting business in the area. The City closed Bleckley Street as part of a plan known as Operation Safe Protest, which the City had developed specifically in anticipation of the Summer of Mercy Renewal.

On July 11, 2001, the City issued one parade permit to OSA for a downtown parade, but denied OSA's ten applications for parade permits near Dr.

Tiller's clinic. Defendants denied plaintiffs' parade applications for two reasons: (1) Bleckley Street was closed; and (2) the parades would interfere with local businesses in violation of Wichita City Code § 5.66.0557. Defendants claimed that once Bleckley Street was closed, it was no longer a street that fell within the parade ordinance. As to interference with businesses, Harlenske acknowledged that the parade ordinance did not allow the City to deny a parade permit merely because the planned parade would interfere with business. See Wichita City Code § 3.13.050. Deputy Chief Cole has approved other parades, knowing that the parades would interfere with local businesses.

*B. Municipal court bond order*

Plaintiffs also challenge a municipal court bond order. The bond order was effective from July 13, 2001, through July 22, 2001, during the Summer of Mercy Renewal. The municipal court order set bond amounts for specific offenses, including assault, battery, disorderly conduct, unlawful assembly, or rioting near Dr. Tiller's clinic. The order set different bond amounts for first arrests and subsequent arrests, and for residents and non-residents of Sedgwick County (where Wichita, Kansas is located).

*C. Procedural history*

On July 13, 2001, plaintiffs filed suit against the City, Deputy Chief Cole, and Assistant City Attorney Harlenske pursuant to 42 U.S.C. §§ 1983 and 1985, alleging violations of the First and Fourteenth Amendments of the United States

Constitution and state constitutional claims. In their complaint, plaintiffs requested declaratory relief, compensatory damages, injunctive relief, and attorney fees.

On July 16, 2001, the district court granted plaintiffs' request for a temporary restraining order so that plaintiffs could hold parades during the Summer of Mercy Renewal. Plaintiffs held parades from July 17, 2001, through July 21, 2001, in downtown and along the Bleckley Street route past Dr. Tiller's clinic.

After the parades were held, the parties pursued discovery and filed various motions. On May 28, 2003, the district court granted in part and denied in part defendants' motion for summary judgment. Specifically, the district court determined that OSA, as an unincorporated association, was a "person" under 42 U.S.C. § 1983 and, therefore, was entitled to seek relief under the same. The district court further held that plaintiffs had standing to challenge the parade ordinance, which it held to be constitutional on its face, but lacked standing to challenge the municipal court bond order. The district court also dismissed the City as a party to the litigation based upon plaintiffs' failure to present evidence that the City had a permanent and well-settled practice of denying parade permits.

Thereafter, the district court held a bench trial on May 28-29, 2003, to resolve plaintiffs' remaining claims. Ultimately, the district court concluded that defendants had no basis for denying plaintiffs' parade applications under the

City's parade ordinance. The district court also concluded that defendants Harlenske and Cole violated plaintiffs' constitutional rights, but it denied plaintiffs' requests for compensatory damages and a permanent injunction. The district court awarded nominal damages to plaintiffs in the amount of $1.00.

In considering plaintiffs' motion for attorney fees, the district court granted the motion in part and denied it in part. Specifically, the district court found that plaintiffs had prevailed in the first part of the litigation when the court issued the temporary restraining order on July 16, 2001, but that they had only formally prevailed at trial. The district court awarded attorney fees only for hours expended to obtain the temporary restraining order, and it also reduced counsels' requested rate.

## II.

The parties raise five issues: (1) statutory interpretation of "person" in Section 1983; (2) standing; (3) causation as to Harlenske and Cole; (4) damages; and (5) attorney fees. We raise the issue of mootness sua sponte.

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo." Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001); Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist., 226 F.3d 1170, 1177-78 (10th Cir. 2000).

*A. Unincorporated association as a Section 1983 plaintiff*

In their cross-appeal, defendants claim that OSA, as an unincorporated association, is not a "person" under 42 U.S.C. § 1983. We agree.

As an initial matter, we note that, notwithstanding plaintiffs' arguments to the contrary, this is a matter of first impression. None of our cases specifically address whether an unincorporated association is a "person" for the purposes of Section 1983. Likewise, the cases cited by the district court and plaintiffs simply permit, with little or no analysis, unincorporated associations to bring suit under Section 1983. Consequently, such cases have limited bearing on our analysis.

We review issues of statutory interpretation de novo, Hill v. SmithKline Beecham Corp., 393 F.3d 1111, 1117 (10th Cir. 2004), and begin with the language of the statute itself, United States Dept. of Treasury v. Fabe, 508 U.S. 491, 500 (1993). In relevant part, 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States *or other person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added). OSA, therefore, can only be a Section 1983 plaintiff if it is a "person" within the jurisdiction of the United States.

While Section 1983 itself is silent as to this issue, the Supreme Court, beginning with Monell v. New York City Department of Social Services, 436

U.S. 658 (1978), has had a number of occasions to consider whether a particular entity is a "person" under Section 1983.  See, e.g, Monell, 436 U.S. at 690 (holding that municipalities are subject to suit as "persons" under Section 1983); Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (holding that a State is not a "person" amenable to suit under Section 1983); Ngiraingas v. Sanchez, 495 U.S. 182, 192 (1990) (holding that neither the Territory of Guam nor an officer thereof acting in his official capacity is a "person" under Section 1983); Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Colony, 538 U.S. 701, 711-12 (2003) (holding that a Tribe is not a "person" who may sue under Section 1983 to vindicate its rights as a sovereign).  Consequently, we are not without guidance in this area.

To determine whether an entity "constitutes a 'person' within the meaning of § 1983, we examine the statute's language and purpose," Ngiraingas, 495 U.S. at 186, while keeping in mind "the 'legislative environment' in which the word [person] appears," Inyo County Cal., 538 U.S. at 711 (citations omitted). Essentially, this requires that we seek an "indicia of congressional intent at the time the statute was enacted." Ngiraingas, 495 U.S. at 187.  In Monell, the Supreme Court considered three factors in holding that Congress intended that municipalities be considered "persons" potentially liable under Section 1983:  (1) legislative history, (2) the general treatment of corporations in 1871, and (3) the Act of Feb. 25, 1871, § 2, 16 Stat. 431 (the "Dictionary Act of 1871").  See

Monell, 436 U.S. at 686-89; see also Ngiraingas, 495 U.S. at 192 n.11 (characterizing Monell as turning on "the legislative history[,] . . . the general treatment of corporations (including municipal corporations) . . . and on the 1871 version of the Dictionary Act").

Although Monell dealt only with municipal *liability* under Section 1983, we have relied upon it to conclude that a municipality may also *bring suit* under Section 1983. Rural Water Dist. No. 1, Ellsworth County, Kan. v. City of Wilson, Kan., 243 F.3d 1263, 1274 (10th Cir. 2001) ("[I]n light of Monell, it would be a strained analysis to hold, as a matter of statutory construction, that a municipal corporation was a 'person' within one clause of section 1983, but not a 'person' within another clause of the same statute.") (quoting South Macomb Disposal Auth. v. Township of Washington, 790 F.2d 500, 503 (6th Cir. 1986)). While there is no *per se* rule of statutory interpretation that identical words used in different parts of the same act are intended to have the same meaning, there is a presumption that this is so. See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 214 (2001). As such, Monell also guides our determination of whether an unincorporated association is a "person" and, thus, a proper claimant under Section 1983.

In light of Monell and its progeny, therefore, we consider (1) the legislative history of Section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of

1871. First, there is no indication within the legislative history of Section 1983 that Congress considered the term "persons" to include unincorporated associations. Rather, the history cited in Monell illustrates that municipalities, unlike unincorporated associations, were targeted as entities to whom Section 1 of the 1871 Civil Rights Act, and therefore Section 1983, applied. See Monell, 436 U.S. at 686-87 ("[Representative] Bingham's further remarks clearly indicate his view that . . . takings by *cities* . . . would be redressable under § 1 of the bill."). In fact, comments made by several members of Congress indicate a restricted view of who could qualify as a proper Section 1983 plaintiff. See Monell, 436 U.S. at 683 ("[Section 1] . . . provides a civil remedy . . . to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution *by reason and virtue of their national citizenship*.") (emphasis added) (quoting Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871)) (Rep. Shellabarger); id. at 685 n.45 ("Representative Bingham, the author of § 1 of the Fourteenth Amendment . . . declared the bill's purpose to be 'the enforcement . . . of the Constitution on behalf of every *individual citizen of the Republic* . . . to the extent of the rights guarantied to him by the Constitution.") (emphasis added) (quoting Cong. Globe, 42d Cong., 1st Sess., App. 81 (1871)).

Next, there was no general understanding in 1871, when the precursor to Section 1983 was passed, that unincorporated associations should be treated as

natural persons. Instead, the common law essentially held that unincorporated associations lacked the capacity to sue or be sued. See United Mine Workers of Am. v. Coronado Coal Co., 259 U.S. 344, 385 (1922) ("Undoubtedly at common law an unincorporated association of persons . . . could only sue or be sued in the names of its members, and their liability had to be enforced against each member."); see also Moffat Tunnel League v. United States, 289 U.S. 113, 118 (1933) ("These [unincorporated association plaintiffs] are not corporations, quasi corporations, or organized pursuant to, or recognized by, any law. Neither is a person in law, and, unless authorized by statute, they have no capacity to sue."); cf. Will, 491 U.S. at 67 ("[I]n enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law. One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles . . . and that they likely intended these common-law principles to remain, absent specific provisions to the contrary.") (citations omitted).

Thus, unlike corporations, it was not well-established, when Section 1 of the Civil Rights Act was enacted, that unincorporated associations should be treated as natural persons. See, e.g., United States v. Amedy, 24 U.S. (11 Wheat.) 392, 412 (1826) ("That corporations are, in law, for civil purposes, deemed persons, is unquestionable."); Louisville, C. & C.R. Co. v. Letson, 43 U.S. (2 How.) 497, 558 (1844) ("[A] corporation created by and doing business in a

-12-

particular state, is to be deemed to all intents and purposes as a person, . . .

capable of being treated as a citizen of that state, as much as a natural person."); Monell, 436 U.S. at 688 n.50 (quoting the statement of a sponsor of Section 1 that "counties, cities, and *corporations* of all sorts . . . have become thoroughly established to be an individual or *person* or entity of the personal existence, of which . . . the United States Constitution does take note and endow with faculty to sue and be sued in the courts of the United States") (emphasis added).  In fact, unincorporated associations lacked the capacity to bring suit when Section 1 of the Civil Rights Act was enacted.

Last, the language of the Dictionary Act of 1871 also shows that unincorporated associations were not intended to be "persons" for Section 1983 purposes.  As the Supreme Court has previously noted, the Dictionary Act of 1871, as it read when Section 1 of the Civil Rights Act was enacted, stated that "in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate."  Will, 491 U.S. at 69 n.8 (citations omitted).  The Supreme Court has further observed that "an examination of the authorities of the era suggests that the phrase ['bodies politic and corporate'] was used to mean *corporations, both private and public (municipal).*"  Id. at 69 (emphasis added). Because an unincorporated association is, by definition, not a corporation, it is therefore also not a "body politic or corporate." Thus, while the Dictionary Act of

-13-

1871 extended the meaning of "person" to include corporations and municipalities, it did not do the same for unincorporated associations.

We do not read the current enactment of the Dictionary Act in 1 U.S.C. § 1 to require a contrary result. That text clearly states, and has since 1948, see Pub. L. No. 80-772, § 6, 62 Stat. 683, 859 (1948), that the word "person" "include[s] corporations, companies, *associations*, firms, partnerships, societies, and joint stock companies, as well as individuals," 1 U.S.C. § 1 (emphasis added). Nonetheless, the current text of the Dictionary Act does not control, because, beginning with Monell, in each instance where the Supreme Court has addressed whether a particular entity is a "person" for the purposes of suing or being sued under Section 1983, it has principally considered the Dictionary Act of 1871. See, e.g, Monell, 436 U.S. at 719 (noting that "the 'usual' meaning of the word 'person' would extend to municipal corporations is also evidenced by [the Dictionary Act of 1871] which had been passed only months before the Civil Rights Act was passed"); Will, 491 U.S. at 66-69 (noting that the Dictionary Act of 1871 did not "counsel a contrary conclusion" that a state was not a "person" amenable to suit under Section 1983 and focusing on "deciphering congressional intent as to the scope of § 1983"); Ngiraingas, 495 U.S. at 187 (noting that "[w]e seek . . . indicia of congressional intent at the time the statute was enacted" and that a "review of § 1983's history uncovers no sign that Congress was thinking of Territories when it enacted the statute over a century ago in 1871"); Inyo County,

-14-

Cal., 538 U.S. at 714 n.1 ("The Dictionary Act [of 1871], which was passed just two months before § 1983 and was designed to supply rules of construction for all legislation, provided that 'the word 'person' may extend and be applied to bodies politic and corporate . . . .'").  In other words, in attempting to discern the meaning of "person" as used in Section 1983, we look not to how the words are defined now, but rather at how they were defined at the time the statute was enacted.

This approach is also consistent with the Supreme Court's general use of the Dictionary Act as a tool of statutory construction.  See, e.g., Rowland v. California Men's Colony, Unit II Men's Advisory, 506 U.S. 194, 204 (1993) (using expanded definition of "person" from the 1948 version of the Dictionary Act in addressing whether an association is a "person" for the purposes of 28 U.S.C. § 1915, because the former was enacted prior to the latter); cf. United States v. A & P Trucking Co., 358 U.S. 121, 123 n.2 (1958) ("It is significant that the definition of 'whoever' in 1 U.S.C. § 1 was first enacted into law as part of the very same statute which enacted into positive law the revised Criminal Code. The connection between 1 U.S.C. § 1 and the Criminal Code, which includes [the statute at issue], is thus more than a token one, the very same statute which creates the crime admonishing 'whoever' is to be liberally interpreted.").  Additionally, at least one other circuit has held that the current version of the Dictionary Act only applies prospectively.  See Yousuf v. Samantar, 451 F.3d

248, 254 (D.C. Cir. 2006) (holding that the current definition of "person" in the Dictionary Act "does not apply to a Rule promulgated before the current version of the Act was passed"). As the expanded definition of "person" in the current text of 1 U.S.C. § 1 was added more than seventy years after the enactment of Section 1 of the Civil Rights Act, it is not an indicia of Congress' intent to deem an unincorporated association a "person" under Section 1983. In sum, none of the aforementioned factors, legislative history, general understanding, or the Dictionary Act of 1871, suggest Congress' intent to entitle unincorporated associations to seek redress under Section 1983.

The district court, in contrast, did not rely on any of these factors in reaching the opposite conclusion. Instead, in addition to case law which did not adequately address the issue, the district court relied heavily upon analogy to other entities permitted to sue under Section 1983, such as corporations, Indian tribes and unions. We conclude that these analogies are ultimately unconvincing, particularly in light of our analysis of the abovementioned Monell factors. Specifically, both non-profit and for-profit corporations clearly fall into the category of "bodies corporate" within the meaning of the 1871 Dictionary Act and, thus, could properly be considered persons under Section 1983. See Will, 491 U.S. at 69 n.8. The analogy between tribes and unincorporated associations is also dubious, having been called into question by the Supreme Court's recent decision holding that a tribe does not qualify as a "person" who may sue under

Section 1983 to vindicate its rights as a sovereign. See Inyo County, Cal., 538 U.S. at 711-12. As for labor unions, it is true that they have been permitted to bring suit under Section 1983. Allee v. Medrano, 416 U.S. 802, 819 n.13 (1974) (noting that "[u]nions may sue under 42 U.S.C. § 1983 as persons deprived of their rights secured by the Constitution and laws"). However, this is likely based on the similarities between unions and corporations, rather than an implicit recognition of the right of unincorporated associations to sue under Section 1983. See United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 386 (1922) (holding that labor union could be sued for antitrust violations and describing the "affirmative legal recognition of their existence and usefulness and provisions for their protection").

We conclude, therefore, that the Dictionary Act of 1871, the common understanding regarding unincorporated associations in 1871, and the legislative history of Section 1 of the Civil Rights Act of 1871 fail to indicate a congressional intent to include unincorporated associations within the ambit of the term "person" as set forth in 42 U.S.C. § 1983. As such, we reverse the district court's ruling that OSA is a "person" entitled to bring a claim under Section 1983, and we remand with direction to dismiss OSA's claims.

*B. Standing and mootness*

Both plaintiffs and defendants raise standing issues. Defendants contend that plaintiffs lack standing to challenge the parade ordinance. Plaintiffs argue

that the district court erred in concluding they did not have standing to challenge the municipal court order.

Whether a plaintiff has standing is a legal question, which we review de novo. Ward v. Utah, 321 F.3d 1263, 1266 (10th Cir. 2003). To show Article III standing, a plaintiff must establish three elements: (1) "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) traceability; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). Plaintiffs have the burden to demonstrate standing for each form of relief sought. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 185 (2000); Tandy v. City of Wichita, 380 F.3d 1277, 1284 (10th Cir. 2004). Although we first determine whether a plaintiff has standing as of the time the action is brought, Utah Ass'n of Counties v. Bush, 455 F.3d 1094, 1099) 10th Cir. 2006); Tandy, 380 F.3d at 1284, the plaintiff must continue to have standing throughout the litigation. "[A] plaintiff must maintain standing at all times throughout the litigation for a court to retain jurisdiction." Phelps v. Hamilton, 122 F.3d 1309, 1315 (10th Cir. 1997) (internal quotation marks omitted); Yellow Cab Coop. Ass'n v. Metro Taxi (In re Yellow Cab Coop. Ass'n), 132 F.3d 591, 594 (10th Cir. 1997).

Although the parties do not raise mootness as an issue on appeal, given the progression of events since this litigation was filed, we must also consider

-18-

whether the case is moot. See Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). "[P]ast exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effects." McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996).

The district court held that plaintiffs had standing to challenge the parade ordinance, but it did not analyze standing for each form of relief sought. Applying de novo review, we ask whether plaintiffs have standing to pursue their claims for compensatory damages, declaratory relief, and injunctive relief, and further, whether their claims are now moot.

*1. Parade ordinance*

*a. Compensatory damages*

We conclude that Lippoldt and Benham have standing to seek compensatory damages for the denial of the parade permits.

Defendants contend that the individual plaintiffs lack standing because they did not apply for the parade permits. We disagree. Although the permits were in OSA's name, Lippoldt and Benham participated in the parades as OSA volunteers. They suffered injury by the alleged abridgement of their First

Amendment rights when the City denied the parade permits.  A favorable decision in this case would redress their injury by ordering the defendants to allow the parades and compensating them for any damages sustained.  Lippoldt and Benham have standing to seek damages for the denial of the parade permits.

Moreover, plaintiffs' claim for compensatory damages is not moot.  Even though the district court granted the temporary restraining order and the plaintiffs held the parades, plaintiffs may still contest the district court's denial of compensatory damages.  "[B]y definition claims for past damages cannot be deemed moot."  See Taxpayers for the Animas-La Plata Referendum v. Animas-La Plata Water Conservancy Dist., 739 F.2d 1472, 1479 (10th Cir. 1984).  At trial, the district court awarded only nominal damages, and plaintiffs argue on appeal that they should have received compensatory damages.  Under these circumstances, plaintiffs' claim for compensatory damages remains a live case or controversy on appeal.  Plaintiffs' claim for past damages is not moot.

*b. Declaratory relief*

Similarly, plaintiffs have standing to seek declaratory relief.  A claim for "declaratory judgment is generally prospective," but we treat declaratory relief as retrospective "to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred."  PETA v. Rasmussen, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002); Faustin v. City & County of Denver, 268 F.3d 942, 948 (10th Cir. 2001).

Moreover, plaintiffs' claim for declaratory relief is not moot where the district court must determine whether a past constitutional violation occurred which will in turn affect the parties' current rights or future behavior. Green v. Branson, 108 F.3d 1296, 1299-1300 (10th Cir. 1997).

Just as plaintiffs have standing to seek damages, they have standing to seek declaratory relief, and their claim is not moot. Throughout the entire litigation, the parties have disagreed whether the defendants violated the First Amendment in denying plaintiffs' parade permits, and plaintiffs sought damages for the City's denial of the parade permits. At the bench trial, the district court had to determine whether a past constitutional violation occurred when defendants denied the parade permits. Even on appeal, a live controversy remains. Plaintiffs challenge the district court's denial of compensatory damages. Defendants challenge the district court's determination that Cole and Harlenske are liable pursuant to 42 U.S.C. § 1983. Thus, plaintiffs have standing to seek declaratory relief concerning denial of their parade permits in July 2001, and their claim is not moot.

*c. Injunctive relief*

Although plaintiffs have standing to seek compensatory damages and declaratory relief, they have no standing to seek a permanent injunction. See Faustin, 268 F.3d at 948 (holding that plaintiffs had standing to seek declaratory relief and nominal damages, but lacked standing to pursue injunctive relief).

-21-

Plaintiffs "seeking prospective relief must show more than past harm or speculative future harm." Riggs v. City of Albuquerque, 916 F.2d 582, 586 (10th Cir. 1998). In Tandy v. City of Wichita, we concluded that the plaintiff had standing to seek prospective relief by alleging an intent to use the city's fixed-route bus "'several times per year'" because this suggested a "concrete, present plan" to use it each year. 380 F.3d at 1284. "A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction." Id. at 1283-84.

Although plaintiffs had standing to seek a permanent injunction on the day that they filed the complaint, circumstances changed when the district court granted plaintiffs' motion for a temporary restraining order on July 16, 2001, and ordered the City to allow the parades. Once plaintiffs held the parades in July 2001, they lacked standing to seek a permanent injunction because plaintiffs cannot demonstrate injury in fact.

Further, plaintiffs have failed to allege a concrete, present plan to apply for another parade permit in the future. Of the plaintiffs, Lippoldt has the strongest argument that she intends to apply for another parade permit, but she did not specify a concrete plan to do so. She lives in Wichita, and she even applied for a parade permit in October 2001, which the City granted. Aside from past harm, Lippoldt alleges only speculative future harm, which is insufficient for standing to seek injunctive relief. See Riggs, 916 F.2d at 586. Lippoldt testified that it is

"very likely" that both OSA-Wichita and she personally will apply for parade permits in the future. App. Vol. V at 724-725. As to whether she had specific plans for filing a parade permit in Wichita, Lippoldt responded "[n]ot dates but there has been talk of plans." Id. at 725. In responding to a question whether she had any current plans to submit parade permit requests, she responded "[y]es, probably. Hasn't been confirmed but there's talk of another one. I mean, we don't have a date. . . . We are talking about it but we have not chosen a date." Id. at 725. Lippoldt's averred intent does not confer standing to seek injunctive relief because she has not alleged a concrete, present plan to apply for another parade permit.

Lippoldt alleges precisely the sort of speculative future harm that did not confer standing in Lujan v. Defenders of Wildlife. In Lujan, the Supreme Court held that the plaintiff lacked standing to seek prospective relief because plaintiff alleged that "'I intend to go back to Sri Lanka,'" but admitted that she had "no current plans" by testifying that "'I don't know [when] . . . . Not next year, I will say. In the future.'" 504 U.S. at 564. Lippoldt's allegations are equally deficient. Like Lippoldt, Benham also lacks standing to seek injunctive relief because he fails to allege a concrete future injury. Benham stated that neither he nor OSA intended to parade in Wichita in the future.

Plaintiffs fail to demonstrate standing to seek prospective relief, including a permanent injunction, since they held the parades in the Summer of Mercy

-23-

Renewal and have not alleged a concrete plan to hold a parade in Wichita in the future.[2] Because plaintiffs lack standing to seek injunctive relief, we do not consider their claim that the district court erred in denying their request for injunctive relief.

*2. Municipal court bond order*

Plaintiffs maintain that the district court erred in concluding that they lacked standing to challenge the constitutionality of the bond order. Even if plaintiffs had standing to challenge the bond order, their challenge is moot because they were not arrested during the parades in July 2001, and the bond order expired by its own terms on July 22, 2001.

We may affirm the district court "on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." Griess v. Colorado, 841 F.2d 1042, 1047 (10th Cir. 1988) (internal quotation marks omitted).

Plaintiffs' challenge to the bond order is moot because any relief they seek would have no legal effect. Plaintiffs presented no evidence that the City has threatened to renew the bond order. The bond order was in effect from July 13, 2001, through July 22, 2001. Neither of the named plaintiffs were arrested while

_____

[2] To the extent that plaintiffs seek prospective relief in their claim for declaratory judgment, plaintiffs' request is moot for the same reasons that their claim for injunctive relief is moot.

-24-

the bond order was in place. Plaintiffs have not presented evidence that any OSA volunteers were subjected to the bond order. Moreover, the exception to mootness does not apply because plaintiffs have failed to show a "reasonable expectation" that the controversy regarding the bond order will recur. Honig v. Doe, 484 U.S. 305, 319-20 (1988). Even if plaintiffs had standing to challenge the order at the outset of this litigation, the controversy regarding the bond order became moot when the order expired on July 22, 2001.

*C. Causation under Section 1983*

Defendants argue that the district court erred by concluding that Harlenske and Cole caused plaintiffs' deprivation of their First Amendment rights. We disagree.

Section 1983 requires plaintiffs to show causation, imposing liability on a defendant who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . . ." 42 U.S.C. § 1983. We have explained Section 1983's causation requirement: "[A] defendant may not be held liable under § 1983 unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 518 (10th Cir. 1988). "A plaintiff must allege factual causation -- i.e. 'but for' causation -- in order to state a claim under § 1983." Scott v. Hern, 216 F.3d 897, 911 (10th Cir. 2000). Where multiple "forces are actively operating," as in this case, plaintiffs may demonstrate that each defendant is a concurrent cause by

showing that his or her conduct was a "substantial factor in bringing [the injury] about." Northington v. Marin, 102 F.3d 1564, 1568-69 (10th Cir. 1996) (internal quotation marks omitted). In a case of concurrent causation, the burden of proof shifts to the defendants in that "a tortfeasor who cannot prove the extent to which the harm resulted from other concurrent causes is liable for the whole harm" because multiple tortfeasors are jointly and severally liable. Id. at 1568. Defendants argue that neither Cole nor Harlenske caused the deprivation because they were "subordinate to the causative actors" who actually made the decision to deny the parade permits.[3] Aple. Br. at 50-51.

We address Harlenske's conduct first. Defendants argue that the causal connection between Harlenske's conduct and the ultimate denial is "too tenuous, and too heavily interrupted by the acts and decisions of others." Aple. Br. at 51. We disagree. The record supports the district court's conclusion that Harlenske's conduct caused the violation of plaintiffs' First Amendment rights. Her conduct was a direct cause of the denial of the parade permits, and violation of plaintiffs' First Amendment rights was foreseeable. Harlenske drafted the letter denying the parade permits. After the plaintiffs filed their parade applications, she researched the law on parade applications and learned that the government must have clear

_____

[3] Defendants have not appealed the district court's determination that they acted unconstitutionally in denying the parade permits. Further, the defendants do not raise qualified immunity as an issue on appeal.

guidelines to restrict parades. Despite discovering that denying the parade permits for the reasons offered by the City was most likely unconstitutional, Harlenske advised Cole to sign the denial letter. We agree with the district court that Harlenske's conduct was a substantial factor in denying the parade permits and violating plaintiffs' First Amendment rights.

We next review the evidence of Cole's conduct. Defendants maintain that Cole was "no more than a reluctant scrivener," whose actual participation in the permit denial was negligible because he merely signed the letter on behalf of his superior, the police chief. Aple. Br. at 52. Defendants contend that Cole did not make the denial decision, and that he "took pains to divorce himself from the act, by signing 'for' Chief Norman Williams instead of using his own name." Aple. Br. at 52. But Cole admitted that he did not want plaintiffs to parade near Bleckley Street or Dr. Tiller's clinic, and he agreed with the contents of the letter. Cole personally participated in the denial of the parade permits. Like Harlenske, Cole's conduct was a substantial factor in the denial of plaintiffs' parade permits. Defendants fail to show that the district court erred in concluding that Cole's conduct caused the deprivation of plaintiffs' constitutional rights.

Essentially, defendants complain that plaintiffs sued the wrong defendants. That conduct of other people may have concurrently caused the harm does not change the outcome as to Harlenske and Cole. See Northington, 102 F.3d at

1569. Harlenske and Cole failed to show that the harm should be apportioned to other wrongdoers who are not before the court.

The district court did not err in its conclusion that Harlenske and Cole caused the deprivation of plaintiffs' First Amendment rights.

*D. Denial of compensatory damages*

Plaintiffs argue that the district court erred in denying their request for compensatory damages. We conclude that the district court's decision awarding nominal damages of $1.00 is not clearly erroneous.

Because the "amount of damages is a finding of fact," we review the district court's award of damages in a bench trial under the clearly erroneous standard. Deasay v. United States, 99 F.3d 354, 359 (10th Cir. 1996); Dill v. City of Edmond, 155 F.3d 1193, 1208-09 (10th Cir. 1998).

"The deprivation of constitutional rights, standing alone, does not entitle a plaintiff to general damages." Taxpayers for the Animas-La Plata Referendum, 739 F.2d at 1480-81. Plaintiffs must demonstrate "actual injury" to recover damages under Section 1983 for violation of their constitutional rights. See Dill, 155 F.3d at 1209. In Dill, we reversed a district court's decision awarding $1.00 in nominal damages, reasoning that the evidence supported an award of compensatory damages where plaintiff demonstrated that he lost $2,000 in overtime and special duty pay from the unconstitutional transfer. Id. at 1209.

When denying plaintiffs' claim for compensatory damages in the present case, the district court found that plaintiffs' damages claims were "based on assumptions only." Lippoldt, 311 F. Supp. 2d at 1273. We agree.

Plaintiffs failed to present evidence of compensable injury caused by the denial of the parade permits. Although the City denied plaintiffs' parade permits, the district court ordered the City to allow the parades, and the district court's order was publicized in the media. Thus, plaintiffs were ultimately able to hold the parades as requested in their applications. Plaintiffs presented no evidence of damages caused by the initial denial of the parade permits.

Plaintiffs merely speculated about the amount of damages based upon an alleged potential decrease in offerings received from the July 2001 evening rallies. Benham claimed that the denial of the parade permits affected public perception of the Summer of Mercy Renewal events, causing people to not attend and thereby reducing donations. But the record indicates these offerings were voluntary and were only collected at the evening rallies and not at the parades. We agree with the district court that plaintiffs presented no evidence that the City's initial denial of the parade permits somehow decreased voluntary offerings collected at evening rallies.

Plaintiffs complained about the City's other conduct apart from the denial of the parade permits, but this conduct is not relevant to determining whether plaintiffs demonstrated compensable injury for the denial of parade permits. For

example, Lippoldt testified that the mayor and police chief asked local churches to withdraw their participation in the Summer of Mercy Renewal, apparently because the mayor was concerned that some of OSA's volunteers may be extremists who could harm the pro-life message. Pastor Wright of the Central Christian Church previously had agreed to allow plaintiffs to use church facilities for the evening rallies, but later reneged after meeting with the mayor. Plaintiffs may only seek damages for conduct that violated the Constitution. Because plaintiffs did not demonstrate that the City's other conduct was a constitutional violation, they cannot seek damages for it. While the district court allowed plaintiffs to introduce this evidence to show the City's attitude toward OSA and the Summer of Mercy Renewal events, it is not probative of the amount of damages to which plaintiffs are entitled for the denial of the parade permits.

Although the district court found that plaintiffs failed to prove compensable injury, it awarded nominal damages in the amount of $1.00. The district court reasoned that the deprivation of First Amendment rights constitutes injury. We agree. "[N]ominal damages, and not damages based on some undefinable value of infringed rights, are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 n.11 (1986) (internal quotation marks omitted); Makin v. Colo. Dep't of Corr., 183 F.3d 1205, 1214 (10th Cir. 1999); O'Connor v. City & County of Denver, 894 F.2d 1210, 1215 (10th Cir. 1995). Plaintiffs

-30-

were unable to prove that the denial of the parade permits caused them to suffer compensable injury, but they nevertheless sustained injury from the deprivation of their First Amendment rights. The district court's finding that plaintiffs should receive $1.00 in nominal damages was not clearly erroneous.

Having concluded that plaintiffs cannot obtain compensatory damages, a permanent injunction, or prospective declaratory relief, we must also conclude that, even if we were to assume the dismissal of the City was erroneous, that error is harmless. See Fed. R. Civ. P. 61; 28 U.S.C. § 2111; Fleming Bldg. Co. v. Ne. Okla. Bldg. & Constr., 532 F.2d 162, 165-66 (10th Cir. 1976). Moreover, since the district court declared that Assistant City Attorney Harlenske and Deputy Chief of Police Cole acted unconstitutionally in denying plaintiffs' parade permits in July 2001, plaintiffs succeeded in putting the City on notice about its employees' conduct, even if the declaration did not directly apply to the City. Plaintiffs have not shown how the outcome of the case would differ if the City were a party.

*E. Attorney Fees*

Plaintiffs challenge the district court's decision awarding attorney fees, arguing that the court erred in holding that they were successful only in the first phase of litigation when they obtained a temporary restraining order. Plaintiffs also contest the district court's determination of a reasonable rate.

A reasonable fee is the product of a reasonable rate in the relevant community multiplied by the number of hours reasonably spent on the litigation. E.g., Blum v. Stenson, 465 U.S. 886, 897 (1984); Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). We review the district court's determination of reasonable hourly rate and reasonable hours for abuse of discretion. E.g., Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995).

*1. Reasonable hours*

Plaintiffs argue that the district court abused its discretion in concluding that plaintiffs achieved success only in the first part of the litigation where they obtained a temporary restraining order. We agree.

The district court reduced the lodestar by refusing to award attorney fees for fees incurred after the temporary restraining order was entered. The district court concluded that plaintiffs prevailed from the filing of the complaint until they obtained a temporary restraining order, but that they only formally prevailed in the rest of the litigation.

To be a prevailing party, the plaintiff "must obtain at least some relief on the merits of his claim." Farrar v. Hobby, 506 U.S. 103, 111 (1992). Where a plaintiff seeks compensatory damages but recovers only nominal damages, the plaintiff is a prevailing party, but the district court should determine, in its discretion, whether the "product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Id. at 114

(internal quotation marks omitted). The reasonable fee may be "no fee at all" where plaintiffs seek compensatory damages, but they recover only nominal damages. Id. at 115. But "'nominal relief does not necessarily a nominal victory make.'" Barber v. T.D. Williamson, Inc., 254 F.3d 1223, 1229 (10th Cir. 2001) (quoting Farrar, 506 U.S. at 121 (O'Connor, J., concurring)). "Plaintiff[s] can only obtain an award of attorney's fees for time spent prosecuting the successful claim as well as those related to it." Browder, 427 F.3d at 723; Hensley, 461 U.S. at 440.

To determine whether the plaintiff achieved technical success only, we apply three factors from Justice O'Connor's concurrence in Farrar: (1) the "difference between the amount recovered and the damages sought;" (2) the "significance of the legal issue on which the plaintiff claims to have prevailed;" and (3) the "accomplishment of some public goal other than occupying the time and energy of counsel, court, and client." Barber, 254 F.3d at 1229-30 (internal quotation marks omitted) (adopting factors from Farrar, 506 U.S. at 121-22 (O'Connor, J., concurring)); Brandau v. Kansas, 168 F.3d 1179, 1181-82 (10th Cir. 1999). We have interpreted "significance of the legal issue" as examining the "extent of success." Barber, 245 F.3d at 1231.

The district court specifically referred to Farrar and concluded that the plaintiffs' counsel should be compensated only for reasonable hours expended to obtain the temporary restraining order:

Applying this framework, the court finds the plaintiffs should be compensated for the work reasonably expended in obtaining the temporary restraining order. The temporary restraining order was granted on July 16, 2001. At the trial, the plaintiffs requested a large amount of compensatory damages along with permanent injunctive relief. The court awarded only nominal damages finding "plaintiffs fail to prove they are entitled to compensatory damages." The court further found the plaintiffs did not present an adequate factual or legal basis to merit permanent injunctive relief. During the second and third periods of litigation, the plaintiffs did not achieve results meriting attorney's fees, *i.e.*, the plaintiffs only "formally" prevailed. However, the plaintiffs did achieve more than nominal success in the first period of the trial and should be compensated accordingly.

Order 07/29/04, Aplt. App. at 288. The district court denied counsel's request for attorney fees for all hours worked after July 16, 2001, the date it granted the temporary restraining order. Frederick Nelson, who was lead counsel for plaintiffs, requested $236,437.50 in attorney fees and $18,225.91 in costs, and Donald McKinney, who was local counsel for plaintiffs, requested $39,255 in attorney fees and $235.84 in costs. The district court awarded Nelson $12,424.50 in attorney fees and $733.82 in costs, and awarded McKinney $4,144.59 in fees and no costs.

Although the district court listed the factors from Farrar, it did not consider the second or third factors in declaring that plaintiffs only "'formally' prevailed" in the bench trial. We conclude that the district court abused its discretion in finding that plaintiffs only formally prevailed without giving any consideration to the second and third Farrar factors.

-34-

The district court erred by only considering the first factor from Farrar, which is the difference between the amount recovered and the damages sought. In measuring the relief recovered, the district court gave no weight to the plaintiffs' victory in obtaining a declaration that the defendants deprived them of their First Amendment rights. While the plaintiffs did not demonstrate compensable injury and recovered only nominal damages, the district court declared that Harlenske and Cole were liable under Section 1983 for depriving plaintiffs of their constitutional rights. Contrary to the district court's assumption, obtaining declaratory relief and nominal damages may be sufficient for plaintiffs to recover fees for hours reasonably expended, depending upon the application of the other Farrar factors.

But the district court failed to consider the other Farrar factors -- the significance of the legal issue on which the plaintiff has prevailed and the accomplishment of a public purpose served by the litigation. By ignoring the two other factors, the district court "focus[ed] much of [its] attention on the quantum of relief actually obtained by Plaintiff[s]" and "miss[ed] the point of Farrar." Browden v. City of Moab, 427 F.3d 717, 722 (10th Cir. 2005). By focusing on plaintiffs' recovery of nominal damages, the district court failed to consider the significance of plaintiffs' victory on their First Amendment claim or the accomplishment of a public purpose in the litigation.

We conclude that the district court abused its discretion in failing to consider the significance of plaintiffs' success on their First Amendment claim – the second Farrar factor. See Bangerter, 61 F.3d at 1511 (reversing a district court's determination of limited success where the district court reduced the lodestar by seventy-five percent without assessing the relative importance of each claim). In this case, the extent of plaintiffs' success, which we have interpreted to be the principal gauge for this element, shows that they did more than formally prevail at trial. Although plaintiffs brought other claims, their primary claim was that the defendants violated their First Amendment rights in denying the parade permits. Plaintiffs succeeded on their First Amendment claim because the district court declared that Harlenske and Cole were liable under Section 1983 for causing the deprivation of plaintiffs' constitutional rights. Plaintiffs' other claims were directly related to their First Amendment claim because they were based on the same common facts. Since plaintiffs succeeded on their First Amendment claim, and the First Amendment claim formed the core of their lawsuit, they can recover fees for reasonable hours expended on claims related to their First Amendment claim. See Browder, 427 F.3d at 723.

Moreover, the district court abused its discretion in failing to consider the third factor, which weighs in plaintiffs' favor because they prevailed at trial. We have found the third factor from Farrar satisfied where the "plaintiff's victory encourages attorneys to represent civil rights litigants, affirms an important right,

-36-

puts the defendant on notice that it needs to improve, and/or provokes a change in the defendant's conduct." Barber, 254 F.3d at 1232-33. In the third factor, we have not required the judgment to order a policy change. See Koopman v. Water Dist. No. 1, 41 F.3d 1417, 1421 (10th Cir. 1994).

As for the public importance of this litigation, it has implications not just for OSA's members in particular, but also broader implications for other citizens planning to exercise their First Amendment rights in Wichita by applying for a parade permit. Although this litigation consumed several years of resources to recover declaratory relief and $1.00 in nominal damages, defendants argued vigorously at each phase in the litigation that their decision denying the parade permits was constitutional. Because of plaintiffs' litigation, the district court declared that Harlenske and Cole violated plaintiffs' First Amendment rights by denying plaintiffs' parade permits. Certainly this declaration will encourage Harlenske, Cole, and other City employees to comply with the First Amendment in reviewing future applications for parade permits. Plaintiffs need not obtain a judgment that directs a specific change in City policy for their litigation to have significant implications for others planning to apply for a parade permit in Wichita.

Thus, we conclude plaintiffs achieved more than formal success at trial under the Farrar factors. We reverse the district court's determination concerning

attorney fees, and we remand to the district court to award attorney fees for reasonable hours expended.

*2. Reasonable rate*

Counsel argue that the district court abused its discretion in reducing their rate. To determine what constitutes a reasonable rate, the district court considers the "prevailing market rate in the relevant community." Malloy v. Monahan, 73 F.3d 1012, 1018 (10th Cir. 1996). Plaintiffs must provide evidence of the prevailing market rate for similar services by "lawyers of reasonably comparable skill, experience, and reputation" in the relevant community. Blum, 465 U.S. at 895 n.11; Case v. Unified Sch. Dist. No. 233, 157 F.3d 1243, 1255-56 (10th Cir. 1998). "The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation." Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir. 1983), overruled in part on other grounds, Pennsylvania v. Del. Valley Council for Clean Air, 483 U.S. 711, 725 (1987). If the district court does not have adequate evidence of prevailing market rates for attorney fees, then it may, "in its discretion, use other relevant factors, including its own knowledge, to establish the rate." Case, 157 F.3d at 1257. A district judge may consider his or her "own knowledge of prevailing market rates as well as other indicia of a reasonable market rate." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1493 (10th Cir. 1994) (internal quotation marks omitted).

The district court relied upon the defendants' expert and the district court's "own knowledge of the prevailing market rate." Order 07/29/04, Aplt. App. at 291. The district court concluded that Nelson's requested hourly rate of $325.00 and McKinney's requested hourly rate of $250.00 were above the prevailing market rate for comparable litigation in Wichita, Kansas. The district court found that a reasonable rate for Nelson was $165.00 per hour. The district court found that a reasonable rate for McKinney was $135.00 per hour because he was local counsel and had less responsibility. It reduced the hourly rate as to the law student researchers from $85.00 to $35.00 because plaintiffs failed to present evidence of the prevailing market rates for such research in Wichita.

On appeal, plaintiffs fail to show that the district court abused its discretion in setting the reasonable rates. The record supports the district court's findings that $165.00 was a reasonable hourly rate for Nelson and $135.00 for McKinney, given the prevailing market rates in Wichita. For example, plaintiffs' expert stated that hourly rates for partners at the largest law firm in Kansas ranged from $145.00 to $300.00 per hour. Defendants' expert stated that a reasonable hourly fee is $160.00 for experienced trial counsel for a constitutional case in Wichita. Plaintiffs' counsel argue that their requested rates are reasonable, citing cases from "around the country" where attorney fees were awarded. App. at 48-49. Yet none of these cases involve a fee award in the relevant community, which in this case is Wichita, Kansas. See Blum, 465 U.S. at 895 & n.11.

-39-

Plaintiffs' counsel argue that Frederick Nelson is a national expert in civil rights cases, and that his hourly rate should be a reasonable national rate instead of the rate of the relevant community of Wichita, Kansas. Aplt. Br. at 9. Plaintiffs cite Hendrickson v. Branstad, 934 F.2d 158, 164 (8th Cir. 1991), which upheld a district court's determination that counsel's hourly rate "should be comparable to nationally prominent federal civil rights counsel, rather than local Iowa counsel, because he is a recognized expert in juvenile law." Id. Yet Hendrickson does not require us to reverse the district court's finding that Nelson should receive a local rate in this case. Unless the subject of the litigation is "so unusual or requires such special skills" that only an out-of-state attorney possesses, "the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." Ramos, 713 F.2d at 555; see also Bangerter, 61 F.3d at 1510. Plaintiffs failed to establish that the subject of the litigation was so unusual that only an out-of-state attorney could present the case. We conclude that the district court did not abuse its discretion in applying reasonable hourly rates from attorneys of equivalent skills in Wichita, Kansas.

III.

Accordingly, we AFFIRM the district court's judgment in case number 04-3156. We AFFIRM in part and REVERSE in part the district court's judgment in case number 04-3168, and REMAND to the district court with direction to dismiss OSA's claims. In case number 04-3322, we AFFIRM in part and

-40-

REVERSE in part the judgment of the district court, and REMAND to the district

court to address anew counsels' request for fees and costs.