UNITED STATES of America,
Plaintiff-Appellee,

v.

Victor DUBOISE, a juvenile,
Defendant-Appellant.

No. 78–1449.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 17, 1979.

Decided Aug. 24, 1979.

Robert Bruce Collins, Asst. U. S. Atty. (R. E. Thompson, U. S. Atty., Albuquerque, N. M., on brief), for plaintiff-appellee.

Louis S. Marjon, Albuquerque, N. M., for defendant-appellant.

Before HOLLOWAY, McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This case presents the question whether a 16-year-old American Indian, a member of the Navajo Tribe, is entitled to a jury trial notwithstanding that the proceedings were filed under the Federal Juvenile Delinquency Act pursuant to his electing to have the matter so proceed. The Juvenile Delinquency Act does not, of course, permit trial by a jury. It contemplates that the proceedings will be before a district judge.

The charge here was murder. It was alleged to have been in violation of 18 U.S.C. § 5032.[1]

Accused in the instant case did not request to be proceeded against as an adult. Section 5037 provides that "If a juvenile is adjudicated delinquent, a separate dispositional hearing shall be held no later than twenty court days after trial unless the court has ordered further study."

On April 17, 1978, following a trial before United States District Judge Mechem, the defendant was determined to be a juvenile delinquent. On the basis of this determination, he was, on April 17, 1978, committed to the custody of the Attorney General or his authorized representative for a period not to exceed his minority.

Evidence at the trial showed that the defendant, together with Michael Smith, went to Vanderwagon Village near the Navajo communities of Chi-Chil-tah and Two Wells, New Mexico, in the early evening of November 25, 1977. While there, Duboise had an argument with one Jimmy Nez which arose over the fact that Nez refused to buy beer for Duboise and Smith. Following the argument, there was a fist fight. The fist fight became very furious and resulted in Duboise beating and kicking Nez to the ground. He then forced Nez into his truck and drove to a remote area several miles away. He stopped the truck near two trees, pulled Nez from it and again began to beat him. Michael Smith testified against him at the hearing and said that Duboise threw Jimmy off the truck and started to beat and kick him. Nez, during this time, according to Smith, was trying to

---

1. It provides that:

A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he is requested in writing upon advice of counsel to be proceeded against as an adult * * *"

get away. He was on the ground. However, Smith joined Duboise in the assault notwithstanding that Nez was helpless. Duboise ripped all of the clothing from Nez's body and proceeded to beat him on the face and body with his own belt and buckle. He then hit him with the handle of an axe until the axe handle broke into two pieces. The two left Nez naked by the side of the road. Smith said that Duboise wished to drive the truck over Nez's body, and Smith was able to persuade him not to do it. Duboise and Smith buried Nez's blood-soaked clothing several hundred yards from the site of the beating. Smith testified that the morning after the beating Duboise wore Nez's boots and said to him (Smith), "Here's the boy's boots."

Navajo police discovered Nez's body and contacted the FBI. Richard Sloan, Special Agent, testified at the trial as to what he had observed. This included an axe handle broken into two pieces and a heavy metal belt buckle. Also, he saw bloodstains and scuff marks in the soft dirt leading to Nez's body. Sloan discovered impressions in the dirt where it appeared that Nez had lain during the night and had pulled sagebrush and branches over his body in an attempt to keep warm. Sloan testified at the trial as to the condition of the body; that he observed it; and that it was drawn up as if he were trying to protect himself against the cold. He had numerous scratches, bruises and abrasions all over his body. His face was badly swollen and bruised with blood coming out of the nose, mouth and the ear.

Smith confessed to the FBI as to his role in the beating and also implicated Duboise. He also showed the agents where Nez's clothing was hidden. The agent described the clothing that he found, stating that it was covered with bloodstains.

Smith entered a plea of guilty to voluntary manslaughter for his role in the death. He was shown to have been an adult, and the court sentenced him to an indeterminate period of imprisonment pursuant to the Youth Corrections Act.

Duboise, on December 1, 1977, made a statement to the FBI agents in the Gallup office. His mother and his stepfather accompanied him, and he was fully advised of his constitutional rights not only by Agent Sloan but also by Navajo police officers. After the explanations, the defendant signed the FBI Advice of Rights form. Subsequently, he confessed to the beating of Nez which resulted in his death. His version of it was that he had offered to buy a beer for Jimmy Nez and Jimmy had a bottle of wine. Duboise asked Jimmy Nez for a drink of wine. According to Duboise's statement, Jimmy Nez refused to give him a drink so Duboise became angry and decided that he was going to beat up Jimmy Nez. He said that he had pulled Jimmy Nez out of the vehicle, had thrown him on the ground and had begun to beat and kick him, and at that time called for Michael to come and help him. They began to tear off his clothes while they were beating him. He said that he took Jimmy Nez's belt from his pants and began beating him with the belt and the large silver buckle. He denied that he hit him with an axe handle.

The pathologist testified that in his opinion Nez died of "exposure, in association with severe blunt force trauma, and injury," which had rendered the victim unconscious or incapable of seeking and finding shelter.

The present issue is raised as a result of the motion on the part of Duboise for a jury trial. This was made on April 4, 1978, and immediately preceded the trial. Judge Mechem heard arguments and denied the motion. It is maintained on this appeal that the ruling was in error. Hence, the question is whether inherent in the Juvenile Delinquency Act is the right of trial by jury. It is vigorously argued that it is impossible to waive a jury trial by electing to be tried in accordance with the Juvenile Delinquency provision, 18 U.S.C. § 5032.

The Sixth Amendment guarantees the right to trial by jury in "criminal prosecutions." *See Rosenblum v. United States,* 549 F.2d 1140 (8th Cir. 1977). It is well settled that adjudication of juvenile delinquency and commitment under the Juvenile Delinquency Act is not a conviction of or

sentence for a crime. The object of the proceeding under the Juvenile Delinquency Act is to determine the youth's status as a delinquent. It is a civil rather than a criminal prosecution. *See United States v. Hill,* 538 F.2d 1072 (4th Cir. 1976). Its main purpose is, of course, to remove juveniles from the criminal justice system and place them under a procedure which allows the juvenile to be treated rather than punished and it avoids the stigma of conviction. *See United States v. Mechem,* 509 F.2d 1193 (10th Cir. 1975); *United States v. Hill,* 538 F.2d 1072 (4th Cir. 1976). In this setting the concept of trial to the court rather than to a jury evolved.

We are not lacking in precedents to point the way. The Supreme Court has dealt generally with the subject in *In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), which extended to the juvenile a number of constitutional rights which had theretofore been available only to the adult. In that case Gault, a 15-year-old boy, was taken into custody following a complaint that he had made lewd telephone calls. Hearings were had before a juvenile court judge following which Gault was committed to the state industrial school as a juvenile delinquent for a period until he reached his majority. Gault's father brought a habeas corpus action in state court to challenge the validity of the Arizona juvenile code and the procedure used in the case claiming violations of due process rights. The Arizona Supreme Court affirmed the dismissal of the writ. It held that the delinquency procedure was intertwined with the due process provisions and that these were not violated by the procedures.

The Supreme Court's opinion by Mr. Justice Fortas held that procedural due process applied to the proceedings. This called for written notice informing the accused and his parents of the issues presented and also demanded that there must be advice to the child and his parents of the right to counsel, and that if they are unable to afford counsel, that representation will be provided. Also, the privilege against self-incrimination was held to be applicable, whereby an admission by the juvenile could not be used against him in the absence of clear evidence that admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent. The Court further held that the privilege did not turn on the type of proceeding in which protection was invoked, but, rather, upon the nature of the statement and admission and the exposure which resulted from it. It was further held that inasmuch as delinquency may lead to a state institution it had to be regarded as criminal for the purpose of protecting against self-incrimination. The particular admission or confession in *In Re Gault* was ruled inadmissible.

The *In Re Gault* case did not mention the jury trial question, and it is not to be read as endorsing it. It specified the due process aspects as including the matters listed above and, in addition, the right to a transcript, the right to appeal and the right to confront and cross-examine witnesses. It spoke generally for the principle that neither the Fourteenth Amendment nor the Bill of Rights exist for adults alone.

The Supreme Court's decision in *Kent v. United States,* 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), upholds the capability of a juvenile to waive the exclusive jurisdiction of the juvenile court and thus to elect a trial in an adult criminal court. Close scrutiny is given to whether due process and ordinary fairness attended the waiver.

The argument of the defendant is largely predicated upon the *In Re Gault* recognition that the juvenile proceeded against under the Delinquency Act is entitled to many of the constitutional rights that are extended to adults notwithstanding that the case is being tried as a juvenile case. The appellant's precise point is that the right of trial by jury guaranteed by the Sixth Amendment is perhaps the most important of the fundamental rights contained in the first ten amendments of the Constitution. His further argument is that since the Constitution in many of its important aspects applies to minors or juveniles, the right to trial by jury ought not to be excluded from the list which the Court determined were part of the due process guarantee.

There were various dissents in *In Re Gault*, most of which had some disagreement with the rights which were specified in the majority opinion as being a part of due process. However, no strong advancing in the *In Re Gault* case of a right to trial by jury is apparent.

The impediment to the right which is here asserted is raised in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), and disposed of. There the Court expressly refused to extend the absolute right to a jury trial to juvenile proceedings. In that case Justice Blackmun in reviewing the Supreme Court's decisions in *In Re Gault* "and its progeny" noted that

> The Court, however, has not yet said that all rights constitutionally assured to an adult . . . are to be enforced or made available to the juvenile in his delinquency proceeding. Indeed, the Court has specifically refrained from going that far: "We do not mean by this to indicate that the hearing to be held must conform with all the requirements of a criminal trial . . . but we do hold that the hearing must measure up to the essentials of due process and fair treatment."

403 U.S. at 533–534, 91 S.Ct. at 1980. The Court cited the *Kent* case which said that the juvenile delinquency proceeding was in conformity to a trial with all of its requirements and that there was a requirement that the hearing in the juvenile proceedings had to measure up to the provisions of due process and fair treatment.

McKeiver was shown to have been charged with robbery, larceny and receiving stolen goods as juvenile delinquency. He had requested a jury trial and it was denied. His case was heard by a judge who determined that he was a delinquent following findings that he had violated the laws of Pennsylvania. Thereafter, he was given probation, he appealed and the Supreme Court affirmed. The specific question raised in *McKeiver* and its companions *Terry* and *Burrus* was whether there was a constitutional right to a jury trial in juvenile court. The Supreme Court of Pennsyl-

vania, with one justice dissenting, held that there was not such a right. The Supreme Court recognized that his right to trial by an impartial jury in all criminal prosecutions guaranteed in the Sixth Amendment of the Constitution of the United States did not automatically give the answer to the present jury trial issue. The majority opinion by Justice Blackmun in considering the problem did not regard the fact that the proceeding is considered civil rather than criminal to be significant. The issue, according to Justice Blackmun, was whether the scope of due process included trial by jury in all criminal or quasi-criminal proceedings. It pointed out that the standard of due process as expounded in *In Re Gault* and *In Re Winship*, 397 U.S. 358, 365, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), was fundamental fairness and the requirements of notice, counsel, confrontation and cross-examination. The standard of proof "naturally flowed from this emphasis." The Court added that in our legal system the jury is not a necessary component of accurate factfinding; that juries are not used in equity cases, for example, and that factfinding can be efficiently carried out without the aid of a jury. Given the fact that the jury system is generally preferred for criminal prosecution, it does not follow that it should be used in juvenile proceedings, because, as the Court noted, "There is a possibility, at least, that the jury trial right, if required as a matter of constitutional precept, will remake the juvenile proceeding into a full adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding."

The imposition of the jury trial in the juvenile court system, the Court continued, would not strengthen the factfinding function, and, more important, it would certainly not remedy the defects of the system.

The conclusion was that the arguments necessarily equate the juvenile proceeding with the criminal trial and would, of course, inevitably result in it having the same adversary characteristics that the criminal tri-

al has, a result which would not advance the system. The juvenile court would no longer have a separate existence if all of the formalities of the criminal adversary trial were to be superimposed on it.

We, of course, agree that while there are shortcomings in the juvenile court system, these would not be remedied by adding the jury system with all of its adversarial trimmings to the present system. The aspect of informality, lack of drama and trial by battle generally certainly would not serve to improve the present method.

Finally, the effect of the juvenile procedure is not to absolutely withhold the jury trial. The juvenile *status* does not deny the juvenile a jury trial. He can, if he wishes to have it, elect to be tried under the adult procedure which would give him a right to a jury trial. Understandably he does not wish to invoke all of this.

These then were the reasons for the denial of inclusion of the jury factfinding as part of other due process rights which were recognized in the *In Re Gault* case.

*McKeiver* is a fully and carefully considered decision on the issue which we now consider. The majority consisted of all of the members of the Court except Justices Douglas, Black and Marshall. There were special concurrences by Justice Brennan and Justice Harlan. Accordingly, there is no likelihood that it will be disturbed.

The concluding emphasis should be on the recognition that the *McKeiver* decision of the Supreme Court is the law of the land. This court is not able, even should it choose to do so (and we have no such inclination), to recognize the right which the defendant-appellant advances. In accordance then with the reasoning and our determination that the defendant-appellant's rights are not violated by the denial of a jury trial, it is our conclusion that Judge Mechem correctly applied the law. The judgment should be and the same is hereby affirmed.