HOLMES, Circuit Judge,
concurring in part and dissenting in part.
I write separately because I disagree with two aspects of the majority opinion. First, I believe that the language of the Major Crimes Act (“MCA”), 18 U.S.C. § 1153, is clear and unambiguous. Therefore, while I concur with the conclusion of the majority — that the word “person” in the MCA includes corporations but excludes unincorporated associations — I would reach that result based solely on the plain meaning of the statute’s words in the context in which they are used.
Second, I would hold that the status of the victim as a “person” is an essential element of any offense under the MCA that must be alleged in the charging document and proven beyond a reasonable doubt. By failing to allege that the offense was committed against an “Indian or other person,” the information filed against the defendants did not charge them with the commission of a federal crime. Therefore, the defendants were convicted without due process of law. While we normally review the sufficiency of a charging document for harmless error, in this case the government has failed to argue that the error was harmless. And although we may, in some limited circumstances, undertake a harmless error analysis sua sponte, it is not appropriate for us to do so here. Therefore, I would vacate the defendants’ convictions based on the inadequacy of the information. As a result, I would not reach the defendants’ other arguments.[1]
I. BACKGROUND
Defendants S.W. and R.K. are juveniles and members of the Ute Mountain Indian Tribe. They, along with a third individual, J.C.,[2] set fire to the Ute Mountain Presbyterian Church, located within the Ute Mountain Indian Reservation. There is no real dispute that they committed the acts with which they were charged. Both defendants admitted to federal investigators that they at least “participatefd]” in setting the fire. Aplt. Br. at 5, 8. Neither defendant has challenged their confessions or raised any issue on appeal that even remotely resembles a claim of innocence. Instead, the defendants simply maintain that they cannot be prosecuted under the MCA.
The defendants were charged by information with committing an act of juvenile delinquency, in violation of 18 U.S.C. §§ 5031-5037, 81, and 1153. R., No. OS-1184, Vol. I, Doc. 61, at 1-2 (Superseding Information, filed Jan. 17, 2008). The information alleged that the defendants— “all enrolled members of the Ute Mountain Ute Indian Tribe” — “did willfully and maliciously set fire to or burned a building, namely, the Ute Mountain Presbyterian Church.” Id. The information thus named the defendants as members of the Ute *1178 Mountain Tribe, and it identified the building as being “located within the exterior boundaries of the Ute Mountain Indian Reservation.” Id. But the information was silent as to who owned the church building.
R.K’s bench trial began on February 5, 2008. The government called seven witnesses, including J.C., Pastor Rousset of the Ute Mountain Presbyterian Church, and the Bureau of Indian Affairs agent to whom R.K. had confessed. The government rested its case the same day. R.K. did not call any witnesses. Instead, he moved for a judgment of acquittal. See Fed.R.Crim.P. 29. He argued that one element of any conviction under the MCA is that the underlying offense be committed against “the person or property of another Indian or other person.” 18 U.S.C. § 1153(a). R.K. argued that the government had failed to prove, or even allege, that the church was owned by an “Indian or other person,” which he interpreted as meaning a natural person.
The government responded that it was not required to prove who owned the building, as it was sufficient to have unambiguously identified the building that was burned. In the alternative, the government suggested that the testimony of Pastor Rousset established that the building in question was owned by “the church.” R., No. 08-1184, Vol. II, Doc. 219, Tr. at 92-93 (Trial to Court, dated Feb. 5, 2008). The court ultimately agreed with R.K. It found that the pastor’s testimony did not bear upon who owned the church building. The court further concluded that the information was “pretty shoddy” and that there “has been no offense committed because there is an element missing.” Id. at 98, 101.
The next day, the government moved to reopen its case. It argued that, according to 1 U.S.C. § 1, “person” is broadly defined to include “corporations,” “associations,” and “societies.” R., Supp. Vol. I, Tr. at 4 (Hr’g re Gov’t’s Mot., dated Feb. 6, 2008) (quoting 1 U.S.C. § 1). It interpreted this broad definition as including any individual or group other than a government agency. Id. at 5. The government represented that the building in question was owned by the Ute Mountain Presbyterian Church. It also claimed that the land on which the building was located was owned by the Ute Mountain Tribe and had been leased to the church. According to the government, since the church was not a government agency, it was an “other person” under the MCA.
The government’s argument reflected a subtle shift in its jurisdictional theory, which it subsequently would explicate in its briefing in S.W.’s case. Specifically, the government no longer stressed the view that it was not required to name a victim as long as it unambiguously identified the building that was burned. Rather, its arguments now suggested that the words “Ute Mountain Presbyterian Church” do not identify the building, but, rather, the local congregation that owns the building — that is, the words purportedly identified the victim of the offense. The government was prepared to offer further testimony by Pastor Rousset to prove that the church owned the building. The court granted the government’s motion to reopen. The court also granted R.K. a 45-day continuance to allow him to investigate the Ute Mountain Tribe’s property records.
The trial of S.W. began later that same day. Pastor Rousset testified for the government that the church building was “owned by the Presbyterians. It’s Presbyterian Western Colorado.” R., No. OS-1137, Vol. II, Doc. 127, Tr. at 66 (Trial to Court, dated Feb. 6, 2008). No other evidence as to the ownership of the building was presented. At the close of the government’s ease in chief, S.W. moved for a *1179 judgment of acquittal arguing, as had R.K., that the government had failed to allege or prove that the victim of the arson was a “person.”
The court ordered the parties to submit briefs addressing whether the government had jurisdiction to prosecute S.W. under the MCA. In its brief, the government expressly took the position that it had, in fact, named a victim in the information— the Ute Mountain Presbyterian Church, which was an “association or society” and, therefore, a person under 1 U.S.C. § 1. R., No. 08-1137, Vol. I, Doc. 118, at 9 (Gov’t’s Br. Regarding Jurisdiction, filed Feb. 15, 2008). At a status conference on March 13, 2008, the government said that it was “fine with respect to the facts we’ve already presented in [S.W.]’s case,” that is, Pastor Rousset’s testimony. R., No. 08-1137, Vol. VI, Tr. at 7 (Status Conference, dated Mar. 13, 2008). Nonetheless, it moved to reopen its case in order to call new witnesses, not previously called. The court granted the motion.
When S.W.’s trial resumed four days later, the government once again changed its theory as to who owned the church building. It now argued that the building was owned by the Presbytery of Western Colorado, a nonprofit corporation, and that the congregation of the Ute Mountain Presbyterian Church was a part of the Presbytery, not a separate, unincorporated association in its own right. R., No. OS-1137, Vol. IV, Tr. at 148 (Trial to Court, dated Mar. 17, 2008). The government acknowledged that its previous claims were inaccurate:
We briefed the issue as well as we could with the facts that we had that we were able to elicit at the early February trial. ... And as far as the church being a society or association in the technical terms of that of all of that, at the time that’s the information that I had. I didn’t know that the Presbytery of Western Colorado was a nonprofit corporation ... and the national church was a 501(c).... That was not information that I was aware of.
Id. at 146-47.
In addition to the four new witnesses that the government called, it also introduced a lease for the land on which the church building was built. The lease names the Ute Mountain Presbyterian Church as the lessee, but the lease was signed by an agent of the Presbytery of Western Colorado. A lease modification entered into in 2007, after the fire, again names as lessee the Ute Mountain Presbyterian Church. However, it was signed this time by an agent of the church. An insurance policy for the church building, on the other hand, was taken out by the Presbytery.
The district court concluded that the church building was owned by the Presbytery of Western Colorado which, as a nonprofit corporation, is a “person” within the meaning of the MCA. It also found that the Ute Mountain Presbyterian Church is not an unincorporated association. Instead, it is simply a part of the Presbytery. Id. at 159-60 (holding that the Ute Mountain Presbyterian Church is a “trade name” or a “common way of denominating the particular location of where members who wanted to could go to worship”). The court concluded that S.W. had committed an act of juvenile delinquency by setting fire to the church building.
R.K’s trial recommenced on April 7, 2008. He stipulated that the evidence presented by the government with respect to the ownership of the building could be considered in his case, as well. The court made similar findings of fact as in S.W.’s case and concluded that R.K. had committed an act of juvenile delinquency. This appeal followed.
*1180 II. ANALYSIS
A. Statutory Interpretation
The MCA endows the federal government with exclusive jurisdiction to prosecute an enumerated list of serious offenses committed by Indians within Indian country. 18 U.S.C. § 1153(a). However, the MCA only applies to offenses committed “against the person or property of another Indian or other person.” Id. The parties disagree as to the meaning of “other person.” The defendants argue that, since “Indian” only refers to natural persons, so too must “other person” be limited to individuals. The government contends that “other person” should be broadly interpreted so as to have virtually no limiting effect, except, possibly, to exclude government agencies. Both sides are mistaken. I, like the majority, conclude that “other person” includes individuals and corporations but does not include unincorporated associations. We review de novo this question of statutory interpretation. United States v. Vigil, 334 F.3d 1215, 1218 (10th Cir.2003).
“[I]n all cases of statutory construction, our foremost duty is to ‘ascertain the congressional intent and give effect to the legislative will.’ ” Ribas v. Mukasey, 545 F.3d 922, 929 (10th Cir.2008) (quoting Padilla-Caldera v. Gonzales, 453 F.3d 1237, 1241 (10th Cir.2005)). We begin with the text of the statute, considering “the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701, 711, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003) (looking to “the legislative environment in which the word appears” when considering whether an Indian tribe is a “person” under 42 U.S.C. § 1983 (internal quotation marks omitted)). If the statute is clear and unambiguously answers the question at issue, we need not, and should not, go any further.
In this case, our interpretive task is simplified by the fact that the word “person” was defined by Congress and has been the subject of much litigation. The Dictionary Act of 1871, ch. 71, § 2, 16 Stat. 431, makes it clear that “person” includes corporations.[3] As originally enacted, the Dictionary Act provides that “in all acts hereafter passed ... the word ‘person’ may extend and be applied to bodies politic and corporate, ... unless the context shows that [the word was] intended to be used in a more limited sense.” Id.; see also Will v. Mich. Dep’t of State Police, 491 U.S. 58, 69, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (“[T]he phrase [‘bodies politic and corporate’] ... was used to mean corporations, both private and public (municipal).”).
The Dictionary Act also is consistent with the “general understanding” of the meaning of “person” when the MCA was enacted in 1885. See Lippoldt v. Cole, 468 F.3d 1204, 1213 (10th Cir.2006). Even in 1885, it was well established that corpora *1181 tions were treated as persons. See, e.g., United States v. Amedy, 11 Wheat. 892, 24 U.S. 392, 412, 6 L.Ed. 502 (1826) (“That corporations are, in law, for civil purposes, deemed persons, is unquestionable.”); Louisville, Cincinnati, & Charleston R.R. v. Letson, 43 U.S. 497, 558, 2 How. 497, 11 L.Ed. 353 (1844) (“[A] corporation created by and doing business in a particular state, is to be deemed to all intents and purposes as a person, ... capable of being treated as a citizen of that state, as much as a natural person.”); see also Lippoldt, 468 F.3d at 1214 (collecting cases).
It is equally clear that, in 1885, unincorporated associations were not persons. Lippoldt, 468 F.3d at 1213 (“[T]here was no general understanding ... that unincorporated associations should be treated as natural persons.”). Associations were not distinct legal entities — they had no standing to sue or be sued. United Mine Workers of Am. v. Coronado Coal Co., 259 U.S. 344, 385, 42 S.Ct. 570, 66 L.Ed. 975 (1922) (“Undoubtedly at common law an unincorporated association of persons was not recognized as having any other character than a partnership in whatever was done, and it could only sue or be sued in the names of its members.... ”); Wesley A. Sturges, Unincorporated Associations as Parties to Actions, 33 Yale L.J. 383, 383 (1924) (noting that “[t]he cases are remarkably in accord that ... an unincorporated association cannot sue or be sued in the common or association name,” because “ ‘[tjhere is no such entity known to the law as an unincorporated association’ ” (quoting Pickett v. Walsh, 192 Mass. 572, 78 N.E. 753, 760 (1906))).
There is no reason to believe that when Congress enacted the MCA it intended “person” to have anything other than its commonly accepted meaning. The Dictionary Act acknowledges that, in some cases, the “context” may indicate that a different meaning was intended. However, “context” is to be construed narrowly to mean “the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts, and this is simply an instance of the word’s ordinary meaning.” Rowland v. Cal. Men’s Colony, Unit II Men’s Advisory Council, 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). Thus, the “context” of the MCA justifies our consideration of the Dictionary Act. But it is not a license to stray from the text. In particular, “context” does not include legislative history. Id. at 200, 113 S.Ct. 716 (“If Congress had meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like ‘evidence of congressional intent,’ in place of ‘context.’ ”).
The majority principally predicated its foray into the MCA’s legislative history on its conclusion that the word “person” in its “statutory context” is unclear. Majority Op. at 1167, 1169. However, the fact that “the text of the Act of Congress surrounding the word,” Rowland, 506 U.S. at 199, 113 S.Ct. 716, indicates that the word “person” has “varying usage[s],” Majority Op. at 1167, within the statute does not mean that the specific usage of the term at issue — concerning the victim of a § 1153(a) offense — is less than clear in “Indian or other person.” Indeed, the majority’s reliance on the First Circuit’s decision in United States v. Jimenez, 507 F.3d 13 (1st Cir.2007), cert. denied, — U.S.-, 128 S.Ct. 1321, 170 L.Ed.2d 133 (2008), as support for its argument is misplaced. Jimenez actually militates against the majority’s position. There, the court considered whether the term “person” in the aggravated identity theft statute, 18 U.S.C. § 1028A(a)(l), excludes deceased individuals — that is, whether the statute only covers living individuals. 507 F.3d at 19-20. The court noted that the word “person” viewed “in isolation admits of more than *1182 one meaning,” rendering the meaning of the term “not clear” at first blush. Id. at 19. The court expressly “decline[d] to consider legislative intent,” concluding that the statute’s structure dispelled the “initial,” apparent “ambiguity.” Id. at 20. Similarly, viewed in its appropriately defined statutory context, which includes the Dictionary Act of 1871, and with reference to the common understanding of the term at the time of the MCA’s enactment, the specific usage of the term “person” at issue here simply is not, in my view, unclear. And, therefore, we have no occasion to resort to legislative history.
We faced a similar question of statutory interpretation in Lippoldt, where the question was whether an unincorporated association was a “person” under 42 U.S.C. § 1983. 468 F.3d at 1211. Relying on Monell v. New York City Department of Social, Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), we considered “(1) the legislative history of Section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871.” Lippoldt, 468 F.3d at 1213. While recognizing the obvious parallels between Lippoldt and this case, I do not read Lippoldt as requiring, or even permitting, us to consider the legislative history of the MCA.
The use of legislative history in Monell and Lippoldt is the result of the Supreme Court’s § 1983 jurisprudence. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled by Monell, 436 U.S. at 663, 98 S.Ct. 2018, the Supreme Court held that municipalities were not “persons” under § 1983. In reaching this conclusion, the court relied, in large part, on Congress’s rejection of the so-called “Sherman Amendment.” Id. at 188-92, 81 S.Ct. 473. It interpreted the Amendment as imposing liability on municipalities. The Court concluded that, by failing to adopt the amendment, Congress clearly expressed its intent that municipalities not be subject to § 1983 claims. Id. at 191, 81 S.Ct. 473.
However, in Monell the Court reversed course, holding that a civil rights claim could be brought against a local Board of Education. Monell, 436 U.S. at 701, 98 S.Ct. 2018. Before the Court could conclude that Congress intended “person” to include the Board, it was compelled to explain why its contrary holding in Monroe should be overruled. Id. at 665, 695-99, 98 S.Ct. 2018. Upon a closer reexamination, the Court recognized that the Sherman Amendment, even if enacted, would not have created the kind of municipal liability at issue in Monroe. Monell, 436 U.S. at 664, 98 S.Ct. 2018 (“[T]he nature of the obligation created by that amendment was vastly different from that created by [§ 1983].”).
Thus, the Court’s reliance on legislative history in Monell was necessary to explain why its prior analysis of that same history was mistaken. Here, however, in interpreting the MCA, we are not saddled with a similar burden of overruling a prior, erroneous decision. Therefore, there is no reason for us to consider the history of the MCA. See United States v. Ortiz, 427 F.3d 1278, 1282 (10th Cir.2005) (“When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent.” (internal quotation marks omitted)).
The defendants argue that even if the word “person,” standing alone, generally includes corporations, the phrase “Indian or other person” refers only to individuals. They claim that only an individual can be an “Indian.” Therefore, since “person” is juxtaposed with “Indian,” an “other person” must, like an Indian, mean an “other individual.” They further claim that this reading of the statute is necessary to sup *1183 port the purpose of the MCA, which was to extend federal jurisdiction to certain especially serious Indian-on-Indian crimes. Aplt. Br. at 33; see Keeble v. United States, 412 U.S. 205, 210-12, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). The defendants’ argument is unconvincing. They fail to explain how their proposed interpretation furthers the purpose of the statute. Regardless of how we interpret “other person,” it is undisputed that the MCA creates federal jurisdiction over crimes committed by Indians against other Indians. We must decide what else the MCA covers. Even if the principal purpose of the MCA was to cover intra-Indian crimes, it does not follow ineluctably that this was the statute’s only purpose. Because the principal purpose of the statute is unaffected by our interpretation of “other person,” we cannot conclude that the combination “Indian or other person” manifestly expresses a congressional intent to override the Dictionary Act’s definition.
The defendants also argue that we should construe the MCA as applying only to crimes against individuals because the “rule of lenity” requires ambiguous criminal statutes to be interpreted in favor of the accused. However, as we have stated, the MCA is not ambiguous. “The rule of lenity presupposes the application of a punitive, ambiguous statute, and we apply it ‘only if, after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended.’ ” United States v. Serawop, 505 F.3d 1112, 1121-22 (10th Cir.2007) (quoting Muscarello v. United States, 524 U.S. 125, 138, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998)); see also United States v. Ruiz-Gea, 340 F.3d 1181, 1188 (10th Cir.2003) (“[T]he rule of lenity is applied only when all other techniques for statutory construction leave the court in equipoise.”). Since we have no doubt that corporations are persons under the MCA, the rule of lenity does not apply.
Similarly, the defendants argue that we should adopt a narrow definition of “person” out of respect for Indian sovereignty. As the Supreme Court has explained,
The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit....
The Court has applied similar canons of construction in nontreaty matters.
County of Oneida, N.Y. v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (citations omitted). But, as with the rule of lenity, this canon of construction only applies to ambiguous statutes. See, e.g., White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143-44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (“Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.” (emphasis added)). In particular, we only consider the effect on Indian sovereignty if the statute remains ambiguous even after consulting the legislative history. United States v. Thompson, 941 F.2d 1074, 1077 (10th Cir.1991) (“[WJhen congressional intent with respect to an Indian statute is unclear, courts will presume that Congress intended to protect, rather than diminish, Indian rights. Reference to the legislative history, however, often will resolve uncertainties about the intent of Congress.”). We have already concluded that the MCA is unambiguous and that it is therefore inappropriate for us to consider its legislative history. Thus, the defendants’ invoca *1184 tion of Indian sovereignty must, a fortiori, fail as well.
B. Sufficiency of the Information
The failure of an indictment to allege an essential element of a crime is a constitutional error that we normally review for harmless error.[4] United, States v. Prentiss (“Prentiss II”), 256 F.3d 971, 973 (10th Cir.2001) (en banc), overruled on other grounds by United States v. Cotton, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), as recognized in United States v. Sinks, 473 F.3d 1315, 1317 (10th Cir.2007). I would hold that, in any prosecution under the MCA, the status of the victim as an “Indian or other person” is an essential element that, as a matter of due process, must be pleaded in the information. The government did not do so in this case, and, consequently, the information is inadequate. The government has failed to argue that the inadequacy of the information was harmless error. While we may, in certain limited circumstances, conduct a sua sponte harmless error analysis, it would not be appropriate to do so here. Therefore, I would hold that R.K. and S.W. were convicted without due process of law.
1. The status of the victim as an “Indian or other person” is an essential element of any prosecution under the MCA.
The MCA provides that:
Any Indian who commits against the person or property of another Indian or other person any of the following offenses ... within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the [listed] offenses....
18 U.S.C. § 1153(a). According to the plain language of the statute, the government must prove that (1) the defendant is an Indian, (2) who committed one of the enumerated offenses, (3) against the person or property of another Indian or other person, (4) within Indian country. As already discussed, the term “Indian or other person” includes individuals and corporations, but it does not include unincorporated associations. Thus, an Indian who burns a building within Indian country that is owned by an unincorporated association has not committed arson against the property of an Indian or other person. *1185 Such a burning would not be a federal offense under the MCA.[5]
As the majority recognizes, an information is sufficient “if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.” United States v. Poole, 929 F.2d 1476, 1479 (10th Cir.1991) (internal quotation marks omitted). However, “a purpose corollary to the first is that the [charging document] inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.” United States v. Moore, 198 F.3d 793, 795 (10th Cir.1999) (internal quotation marks omitted). The government has not met its obligation. The information does not contain all of the elements of the offense charged; it fails to allege that the defendants committed an offense against the person or property of another Indian or other person. See Jones v. United States, 526 U.S. 227, 232, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (noting that every “element[ ] must be charged in the indictment”). The information merely alleges that the defendants set fire to a “building, namely, the Ute Mountain Presbyterian Church.” R., No. 08-1184, Vol. I, Doc. 61, at 1-2. Based solely on the information, it is not possible for a court to determine whether the allegation is sufficient to support a conviction. Whether or not the information alleges a federal crime depends on who owned the building. If the building was owned by an unincorporated association, then even if the government proved every fact that it alleged, the defendants still could not be convicted under the MCA.
The conclusion that the status of the victim is an element of § 1153 should follow from our analysis in Prentiss II. In Prentiss II, the defendant was convicted under the Indian General Crimes Act (“IGCA”), 18 U.S.C. § 1152, of committing arson in Indian country. He appealed his conviction on the grounds that the indictment failed to allege that he was a non-Indian and that the building he set fire to belonged to an Indian. Prentiss II, 256 F.3d at 973. The IGCA does not confer federal jurisdiction over crimes committed by Indians against other Indians. Such crimes are generally left to the tribe to prosecute. See Keeble, 412 U.S. at 209-10, 93 S.Ct. 1993 (discussing the history of the IGCA and the MCA). Absent proof that the offense was “interracial,” no federal crime has been committed. Therefore, we concluded that the Indian/non-Indian statuses of the victim and the defendant are “constituent parts of the crime that must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt.” Prentiss II, 256 F.3d at 975 (alteration, citation, and internal quotation marks omitted). Not only is this conclusion consistent with the text of the statute and the long history of Supreme Court cases dealing with federal jurisdiction over Indian country, it “also comports with the usual practice in criminal prosecution.” Id. at 977 (“The terms of § 1152 do not suggest that Congress took the unusual step of requiring the defendant in a criminal case to identify the victims of the crime.”).
Since Prentiss II dealt with the requirements of the IGCA, not the MCA, it is not *1186 binding precedent. However, the same considerations should govern our interpretation of both statutes. In Prentiss II, we held that the Indian/non-Indian status of the victim and the defendant was an essential element of any conviction under the IGCA. In this case, where the information did allege the defendants’ Indian status, we must decide whether the status of the victim as an “Indian or other person” is an essential element of any conviction under the MCA (that is, whether, in the words of Prentiss II, it is a “constituent part[ ]” of the crime that must be charged). Id. at 975. I see no basis for treating these two questions differently. In fact, the arguments in this case are, if anything, even stronger than they were in Prentiss II.
In Prentiss II, the issue was whether, based on the structure of the IGCA, the exclusion of jurisdiction in the case of Indian-on-Indian crimes was an affirmative defense that had to be raised by the defendant. The Supreme Court previously had held that “an indictment or other pleading founded on a general provision defining the elements of an offense ... need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere.” McKelvey v. United States, 260 U.S. 353, 357, 43 S.Ct. 132, 67 L.Ed. 301 (1922).
The government argued that the IGCA’s jurisdictional limitations were contained in such a proviso. The first paragraph of the IGCA is a broad grant of jurisdiction to the federal government to prosecute crimes committed in Indian country. 18 U.S.C. § 1152 (“Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States ... shall extend to the Indian country.”). The second paragraph of the statute then limits that jurisdiction: “This section shall not extend to offenses committed by one Indian against the person or property of another Indian....” Id. While recognizing the force of this argument, we ultimately concluded that despite the two-part structure of the IGCA, the statuses of the victim and the defendant were “so closely intertwined with the definition of the offense that the government must allege them in the indictment.” Prentiss II, 256 F.3d at 979.
Here, the government has not, and could not, make a similar structural argument with regard to the MCA. Unlike the IGCA, the MCA lists all of the requirements necessary to establish jurisdiction in a single sentence. It does not contain any exceptions, exemptions, or provisos. Moreover, it is undisputed that at least some of those requirements, including that the offense be committed within Indian country, must be alleged in the charging document. Cf. id. at 987 (Baldoek, J., dissenting) (“No one disputes that under § 1152 an element of the crime of arson which the Government must allege is that it occurred in Indian country....”). I see no reason to treat the requirement that the offense be committed against an Indian or other person any differently.
The majority does not discuss the implications of Prentiss II for the sufficiency vel non of the information. Instead, it relies on Moore for the proposition that “[a]s a general rule, an erroneous reference to the victim is not fatal to the indictment.” Moore, 198 F.3d at 796. In Moore, the defendant was charged with carjacking under 18 U.S.C. § 2119. The statute required that the car be taken “from the person or presence of another,” and the indictment named Brent Byers, the owner of the car, as the victim. Id. However, it was proven at trial that Mr. Moore actually took the car from Anne Byers, Mr. Byers’s wife. At the close of the evidence, the court altered the indict *1187 ment to name Anne Byers as the victim. Id. at 795. We held that this change was merely a variance, not an amendment to the indictment. Furthermore, the variance was not fatal, because “the defendant was not misled by the variance” and was able to “present[] his defense with the knowledge that Anne Byers was the alleged victim of the crime.” Id. at 796. We therefore affirmed the conviction.
Moore is inapposite and should not control the outcome of this case. Regardless of who the victim was, Mr. Moore was still charged with committing a federal offense, that is, taking a motor vehicle from the person or presence of another. The indictment alleged each and every element of the offense. Even though the indictment misidentified the victim, there was no question that Mr. Moore’s alleged conduct would, if proven, violate the carjacking statute. The same cannot be said here. Absent any language indicating that the church building was owned by an individual or corporation, the information did not charge R.K. and S.W. with a crime.
The authority relied upon in Moore is similarly distinguishable and unpersuasive. In Dye v. Sacks, 279 F.2d 834 (6th Cir. 1960), the defendant filed a habeas corpus petition, claiming that the trial court had impermissibly amended the indictment by correcting the name of the victim. The Sixth Circuit denied the petition, because “[t]he amendment did not change the nature of the offense charged.... It related to a matter of form and not of substance.” Id. at 837. Here, however, the failure to name any victim did “change the nature of the offense,” and, more to the point, it affected whether there was any offense charged at all. Therefore, insofar as the majority’s argument for the alleged legal sufficiency of the information is predicated on Moore, it is, in my view, misguided.
2. In light of the government’s failure to address the issue, we should not consider, sua sponte, whether the insufficiency of the information was harmless error.
Having concluded that the information filed against the defendants was inadequate, we next turn to the question of whether the error was harmless. In general, “the government bear[s] the burden of proving harmlessness.” United States v. Caraway, 534 F.3d 1290, 1302 (10th Cir.2008). Here, the government unquestionably has failed to carry its burden. The government’s brief does not address the sufficiency of the information. There is no discussion of the issue, whatsoever.[6] In particular, the government never argues, or even suggests, that any potential error in the information would be harmless. Therefore, we must first decide whether it is appropriate to conduct the harmless error analysis sua sponte. Given the evidence presented at trial, I believe that the harmlessness of the error is too uncertain. Based on our decision in United States v. Holly, 488 F.3d 1298 (10th Cir.2007), we should not reach out to decide whether the error was harmless.
“[W]here the government has failed to assert harmless error, this court ‘may in its discretion initiate harmless error review in an appropriate case.’ ” Id. at 1307-OS (quoting United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir.1999)). However, we “should ... be hesitant to engage in an ‘unsolicited, unassisted, and *1188 undirected harmless error review.’ ” Id. at 1308 (quoting Samaniego, 187 F.3d at 1225). We have identified three factors that we consider in determining whether to exercise our discretion: “(1) the length and complexity of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings in the district court.” Samaniego, 187 F.3d at 1225. The most important of these factors is the certainty of the result.[7] See Holly, 488 F.3d at 1308 (“Despite this court’s general reluctance to sua sponte apply harmless error review, it may be appropriate to do so where the certainty of the harmlessness is readily apparent.”). “Evaluation of the certainty of the harmlessness necessarily requires this court to review the record to some extent, though not to the same degree as would be required pursuant to a full harmless error review.” Id.
The district court found that the jurisdictional requirements of the MCA were satisfied. It based its conclusion on two related factual findings: (1) that the Ute Mountain Presbyterian Church is a part of the Presbytery of Western Colorado and does not have a separate and independent existence in its own right, and (2) that the church building was owned by the Presbytery, which is a nonprofit corporation. I cannot conclude that these factual determinations were “uncontested and supported by overwhelming evidence.” Neder v. United States, 527 U.S. 1, 17, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). An error is harmless only if no reasonable fact-finder could have reached a contrary conclusion. United States v. Prentiss (“Prentiss III ”), 273 F.3d 1277, 1279 (10th Cir.2001). Even assuming that there was sufficient evidence supporting the district court’s findings,[8] the district court’s findings were not the only ones that reasonably could have been drawn from the evidence.
Kim Maria Ruth Nofel, a “minister of word and sacrament for the Presbyterian Church U.S.A.,” R., No. 08-1137, Vol. IV, Tr. at 113, testified that the Ute Mountain Presbyterian Church is a “mission church,” and, as such, “is under the guidance and encouragement and support of the Presbytery of Western Colorado.” Id. at 114-15. She also testified that the church is governed by the Towaoc Ministry Board, which is a committee of the Presbytery. Id. at 114, 115-16. Her testimony is certainly consistent with the idea that the church is a part of the Presbytery. The district court appears to have given significant weight to the classification of the Ute Mountain Presbyterian Church as a mission church. The court recognized that some local churches contained within the geographic boundaries of the Presbytery may indeed be separate corporate entities, apart from the Presbytery. Id. at 156-57. Nonetheless, it concluded that, as a mission church, the Ute Mountain Presbyterian Church was too reliant on the Presbytery to be considered an independent association.
*1189 Nothing in Ms. Nofel’s testimony, however, compels the court’s conclusions. Ms. Nofel testified that, although she was not certain, she suspected that the Ute Mountain Presbyterian Church — like her church, the Montezuma Valley Presbyterian Church — was incorporated. Id. at 123. Thus, it is possible for a mission church to receive guidance and support from the Presbytery and yet still remain a separate and distinct legal entity. Moreover, as the defendants point out, the Book of Order, which is the Constitution of the Presbyterian Church, specifically recognizes that churches may be organized as unincorporated associations and that such associations can hold legal title to property.[9] Aplt. Br. at 51 & Attach. 6. Thus, the testimony of Ms. Nofel does not definitively resolve the issue of whether the defendants committed an offense against a “person.”
The other evidence relied on by the government and the district court is equally ambiguous. For example, the government introduced the lease for the land on which the church building was built. The lease names the Ute Mountain Presbyterian Church as the lessee, yet the lease was signed by a representative of the Presbytery of Western Colorado. Both parties make legitimate arguments that the lease supports their position. Similarly, the district court found persuasive the fact that the church building was covered by the Presbytery’s insurance policy. After the church was burned, the proceeds of the policy were paid to the Presbytery. The court noted that “[i]nsurance documents can in some respects be important indicia of who owns a piece of property.” R., No. 08-1137, Vol. IV, Tr. at 157. But even the insurance policy is not conclusive. According to Ms. Nofel, the Presbytery maintained an umbrella policy that covered all the church buildings within the Presbytery, including those of churches that own their own buildings, such as the Montezuma Valley Presbyterian Church, which she testified is a nonprofit corporation. Id. at 118, 123, 125. So even if the insurance policy provides “important indicia,” it is still amenable to multiple interpretations.
The question of whether the government had jurisdiction to prosecute the defendants under the MCA was fiercely contested in the district court. It was, in fact, the only issue raised by the defendants. Furthermore, the evidence relied upon by the district court is less than overwhelming. Thus, without deciding whether the government’s error was harmless, the question of harmlessness is not so certain or readily apparent as to justify our conducting a sua sponte review.
III. CONCLUSION
I agree with the majority that the word “person,” as used in the MCA, includes both individuals and corporations but excludes unincorporated associations. However, for the foregoing reasons, I would hold that the information filed against the defendants was inadequate in that it failed to allege that the offense was committed against an “Indian or other person.” Moreover, the government failed to argue that the error was harmless. And I would conclude that it is not appropriate, in this case, to perform a sua sponte harmlessness analysis. I would, therefore, reverse the decision of the district court and vacate the convictions of the defendants. I respectfully dissent.

. Specifically, it is not necessary to decide whether the district court abused its discretion in allowing the government to reopen its cases to present evidence as to the ownership of the church building. Nor need we decide whether there is sufficient evidence to support the district court’s conclusion that the building was owned by the Presbytery of Western Colorado.

. J.C. eventually pleaded guilty and agreed to testify against S.W. and R.K.

. The government suggests that we should rely, instead, on 1 U.S.C. § 1, the current version of the Dictionary Act, which defines "person” much more broadly. The current version includes not just corporations within the definition but also "companies, associations, firms, partnerships, and joint stock companies.” 1 U.S.C. § 1. However, when interpreting a statute, we look to the version of the Dictionary Act in existence when the statute was enacted. See Lippoldt v. Cole, 468 F.3d 1204, 1214 (10th Cir.2006) (noting that when interpreting 42 U.S.C. § 1983, "the current text of the Dictionary Act does not control, because, beginning with Monell, in each instance where the Supreme Court has addressed whether a particular entity is a 'person' for the purposes of suing or being sued under Section 1983, it has principally considered the Dictionary Act of 1871”).

. An indictment serves two constitutional purposes:
First, it informs the defendant of the nature and cause of the accusation as required by the Sixth Amendment of the Constitution. Second, it fulfills the Fifth Amendment’s indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime.
United States v. Prentiss (“Prentiss I"), 206 F.3d 960, 964 (10th Cir.2000) (internal quotation marks omitted), vacated in pari by Prentiss II, 256 F.3d at 981. However, in this case, the defendants are juveniles, and a juvenile delinquency adjudication "is a civil rather than a criminal prosecution.” United States v. Duboise, 604 F.2d 648, 650 (10th Cir.1979). Therefore, the Fifth and Sixth Amendments are not directly applicable. In a delinquency proceeding, juveniles do not have a right to be indicted by a grand jury. United States v. Indian Boy X, 565 F.2d 585, 595 (9th Cir.1977). Instead, the government may proceed by information, as they did here. See 18 U.S.C. § 5032.
However, delinquency proceedings must provide due process. In re Gault, 387 U.S. 1, 27-28, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In particular, juveniles must be provided notice of the charges against them. Id. at 33, 87 S.Ct. 1428 ("Due process of law requires notice of the sort ... which would be deemed constitutionally adequate in a civil or criminal proceeding.”). Therefore, the failure of an information to allege all the essential elements of an offense is still a constitutional error, albeit under the Due Process Clause, rather than the Fifth or Sixth Amendment. I would apply the same standard of review to an information that we would to an indictment.

. The defendants have suggested that they might have been prosecuted in federal court under the Indian General Crimes Act, 18 U.S.C. § 1152. See Aplt. Br. at 19. However, the defendants were not charged under the General Crimes Act, and the scope of that statute is not before us.

. When asked at oral argument whether its brief responded to the defendant’s insufficiency of the information claim, the government stated that it believed the issue was addressed in the same footnote that addressed our decision in Prentiss II. The government appears to be referencing footnote 14. Aplee. Br. at 40 n. 14. However, footnote 14 does not address the issue.

. We have repeatedly questioned the wisdom of relying on the third factor. See Samaniego, 187 F.3d at 1225 n. 2; Holly, 488 F.3d at 1308 n. 8. Moreover, I am sympathetic to Judge Tacha's concern that we not allow ourselves to be dissuaded from pursuing the correct result simply because the record is long and complicated. Samaniego, 187 F.3d at 1227 (Tacha, J., dissenting) ("In my judgment, an appellate court cannot be excused from its duty to study a record ... just because a record is lengthy and/or complicated. The scope of the record does not excuse the appellate court from reviewing it and attempting to determine whether harmless error analysis is appropriate.").

. In addition to their challenge to the sufficiency of the information, the defendants also argue that there was insufficient evidence to support the district court's factual findings. Because I would reverse based on the inadequate information, I would not reach this argument.

. The same provisions specify, however, that all property held by or for a church, regardless of whether or not it is incorporated, is held in trust for the national Presbyterian Church (U.S.A.). Aplt. Br. Attach. 6.